# United States Court of Appeals for the Federal Circuit

04-5101

PGBA, LLC,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

WISCONSIN PHYSICIANS SERVICE INSURANCE CORPORATION,

Defendant-Appellee.

Kathleen E. Karelis, Miller & Chevalier Chartered, of Washington, DC, argued for plaintiff-appellant. On counsel were W. Jay DeVecchio and Lisanne E.S. Cottington.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Brian M. Simkin, Assistant Director.

Steven S. Diamond, Arnold & Porter LLP, of Washington, DC, argued for defendant-appellee, Wisconsin Physicians Service Insurance Corporation. Of counsel on the brief were Walter F. Zenner, Jr., Marc A. Stanislawczyk, Joseph M. Catoe and Matthew H. Solomson.

Appealed from: United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

04-5101

PGBA, LLC,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

WISCONSIN PHYSICIANS SERVICE INSURANCE CORPORATION,

Defendant-Appellee.

---

DECIDED: November 22, 2004

---

Before RADER, SCHALL, and PROST, Circuit Judges.

SCHALL, Circuit Judge.

This is a post-award bid protest case. On September 6, 2002, the Department of Defense, Military Health Care System, TRICARE Management Activity ("TMA"), issued a request for proposals ("RFP") for a contract for the handling of claims processing for certain beneficiaries under a military health care benefits program known as "TRICARE." Plaintiff-Appellant PGBA, LLC ("PGBA"), submitted a proposal in response to the RFP, as did Wisconsin Physicians Service Insurance Corporation ("WPS"). On

July 25, 2003, TMA awarded the contract to WPS. After unsuccessfully challenging the award before the General Accounting Office ("GAO"), PGBA filed suit in the United States Court of Federal Claims seeking to have the award of the contract to WPS set aside. WPS entered the suit as intervening defendant.

In due course, the parties cross-moved for summary judgment on the administrative record. On March 31, 2004, the Court of Federal Claims granted-in-part and denied-in-part PGBA's motion. Although the court found that TMA had committed errors that materially affected the bidding process adversely to PGBA, it declined to set aside award of the TRICARE contract to WPS. It did, however, rule that PGBA was entitled to recover its reasonable bid preparation and proposal costs. PGBA, LLC v. United States, 60 Fed. Cl. 196 (2004) ("Initial Decision"). Subsequently, on May 12, 2004, the court denied PGBA's second motion for reconsideration.[1] PGBA, LLC v. United States, 60 Fed. Cl. 567 (2004) ("Final Decision"). This appeal by PGBA followed. Because we conclude that the decision of the Court of Federal Claims does not represent an abuse of discretion, we affirm.

BACKGROUND

I.

TRICARE is a military health care benefits program that provides health care benefits to dependents of active duty service members and to retired service members and their dependents. TRICARE is administered within the Department of Defense by TMA. Until recently, the TRICARE system was divided into eleven geographical

---

[1] PGBA filed its first motion for reconsideration after the court issued its original order under seal. The court incorporated the denial of this motion in its March 31, 2004 opinion. Initial Decision, 60 Fed. Cl. at 222-23.

regions.  TMA administered the eleven regions through seven Managed Care Support ("MCS") contracts with prime contractors.  The prime contractors, in turn, outsourced the claims processing through subcontracts with one of two private companies, PGBA or WPS.  PGBA processed claims under five contracts for nine regions, while WPS processed claims under two contracts for the remaining two regions.  Initial Decision, 60 Fed. Cl. at 198.

In October of 2000, Congress enacted legislation known as "TRICARE for Life." Pub. L. No. 106-398, Div. A, Title VII, § 712, 114 Stat. 1654A-176 (2000).  The legislation addressed a problem confronting individuals qualifying for both TRICARE and Medicare benefits—individuals known as "dual eligible beneficiaries."  Namely, prior to the enactment of TRICARE for Life, beneficiaries lost their coverage under TRICARE upon becoming eligible for Medicare.  TRICARE for Life remedies this problem by making Medicare the primary payer and TRICARE the secondary payer for dual eligible beneficiaries.  As secondary payer, TRICARE reimburses that portion of a health benefits claim not covered by Medicare.  Passage of TRICARE for Life forced TMA to address the processing of the new dual eligible beneficiary claims.  TMA did this by modifying the MCS prime contracts.  The prime contractors in turn modified their subcontracts with PGBA and WPS.  Initial Decision, at 198-99.

In 2002, TMA announced that it would restructure TRICARE under a plan known as "TRICARE Next Generation" or "T-Nex."  Under the T-Nex plan, TMA will consolidate the MCS contracts from seven contracts covering eleven regions to three contracts covering three regions.  T-Nex also calls for replacing the subcontracting scheme for dual eligible beneficiaries with one standalone contract for processing all dual eligible

04-5101                                                   3

beneficiary claims, irrespective of geographic region. This new contract is called the "TRICARE Dual Eligible Fiscal Intermediary Contract" or "TDEFIC." TMA estimates that, when fully implemented, TDEFIC will process claims for approximately 1.7 million dual eligible beneficiaries. Id. at 199.

TDEFIC provides for a nine-month transition schedule. The purpose of the schedule is to allow sufficient time to transition the chosen TDEFIC contractor into the new system for processing dual eligible beneficiary claims. During this transition period, PGBA and WPS are to continue processing dual eligible beneficiary claims as subcontractors under the old MCS contracts. In the event more than nine months is needed to make the transition, TDEFIC allows for extension of the transition period, in which case claims processing is to continue under the old MCS contracts. The original transition dates for TDEFIC were: (1) region 11 on April 1, 2004; (2) regions 2 and 5 on June 1, 2004; (3) regions 9, 10, and 12 on July 1, 2004; (4) regions 3 and 4 on August 1, 2004; (5) region 1 on September 1, 2004; (6) regions 7 and 8 on October 1, 2004; and (7) region 6 on November 1, 2004. Evidentiary Hr'g Tr. at 67-68 (Fed. Cl. May 6, 2004) ("Hearing"). On May 12, 2004, the date of the Court of Federal Claims' final decision, region 11 had already transitioned while regions 2 and 5 were within three weeks of transitioning.[2]

II.

On September 6, 2002, TMA issued a RFP for TDEFIC, to which PGBA, WPS, and Unisys Corporation responded with proposals in February of 2003. Upon receipt of

---

[2]    As of the date of our decision in this case, all eleven regions were scheduled to have transitioned to TDEFIC. However, it is the circumstances that existed at the time of the Court of Federal Claims' final decision on May 12, 2004, that are relevant to this appeal.

the proposals, TMA conducted an initial evaluation.[3]  Thereafter, it requested and received final proposal revisions from the three offerors.  TMA evaluated the proposal revisions in June of 2003.  The Source Selection Authority then conducted an independent evaluation of the proposals over the course of two weeks.  TMA ultimately awarded TDEFIC to WPS on July 25, 2003.  In total, it took TMA approximately six months to conduct the evaluation and award the contract.

On August 8, 2003, PGBA filed a post-award bid protest with the GAO.  The GAO issued an automatic stay of the award to WPS pending resolution of the protest.  However, on August 16, 2003, TMA overrode the automatic stay.  PGBA responded by bringing an action in the Court of Federal Claims to enjoin the override.  On September 15, 2003, Judge Allegra issued an injunction dissolving TMA's override and reinstating the automatic stay.  PGBA, LLC v. United States, 57 Fed. Cl. 655 (2003) ("Preliminary Injunction").  The GAO denied PGBA's protest on November 17, 2003, In re PGBA, LLC, Nos. B-292679.2, B-292679.3 (U.S. Gen. Accounting Office Nov. 17, 2003) (filed under seal), at which time the automatic stay and preliminary injunction expired, PGBA, LLC v. United States, No. 03-1986C (Fed. Cl. Nov. 17, 2003) ("Order").

III.

On December 3, 2003, PGBA filed suit in the Court of Federal Claims, praying for the following relief:

---

[3]  The TDEFIC source selection plan divided responsibility among a contracting officer, a Source Selection Authority, a legal advisor, and a Source Selection Evaluation Board ("SSEB"). Initial Decision, 60 Fed. Cl. at 200. The SSEB comprised an Evaluation Team, for evaluating the technical merit of the proposals; a Performance Risk Assessment Group, for evaluating past performance of each offeror; and a Price/Cost Team. See id.

(a)     A declaratory judgment that TMA's decision to award the TDEFIC Contract to WPS is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;

(b)     an order setting aside the award of the TDEFIC to WPS; and

(c)     such other relief as the Court deems appropriate.

(Compl. at 14.)  WPS entered the case as an intervening defendant on December 9, 2003.  On January 15, 2004, PGBA moved for summary judgment on the administrative record.  The United States and WPS responded with their own cross-motions for summary judgment.

On March 31, 2004, the Court of Federal Claims ruled that TMA had acted arbitrarily and capriciously in awarding TDEFIC to WPS.  The court determined that TMA had made several prejudicial errors in its evaluation of the technical merits of PGBA's and WPS's proposals.  Specifically, the court found that portions of the RFP lacked clarity, resulting in uneven treatment of PGBA, Initial Decision, 60 Fed. Cl. at 204-08, and that TMA had erred in evaluating WPS's claims processing capabilities, id. at 210-17.  However, although finding the arbitrary and capricious action by TMA prejudicial to PGBA, the court concluded that the balance of hardships and the public interest favored allowing TMA and WPS to proceed with the contract.  Id. at 220-22.  Therefore, instead of ordering a new solicitation of the contract, the court limited PGBA's relief to its bid preparation and proposal costs.  Id. at 223.

Shortly after the Court of Federal Claims filed its decision under seal, PGBA asked the court to reconsider its decision.  Id. at 222.  PGBA urged the court to set aside the contract and order a reevaluation (as opposed to a new solicitation, a remedy

which the court previously considered and rejected). The court denied the motion, explaining that injunctions do not issue "for every violation of the law," and that, in this case, equity did not warrant an injunction. Id. The court also rejected PGBA's argument that 28 U.S.C. § 1491(b)(4), in combination with 5 U.S.C. § 706(2)(A), required the court to set aside TMA's award of TDEFIC to WPS because the court had found TMA's conduct of the procurement to have been arbitrary and capricious. Id. at 222-23.

PGBA proceeded to file a second request for reconsideration, maintaining that the court was required to set aside arbitrary and capricious agency action and that, in any event, the balance of hardships in the case warranted issuance of an injunction. After conducting an evidentiary hearing on the effects of granting or denying injunctive relief, the court again determined that the balance of hardships did not warrant an injunction. Accordingly, the court denied PGBA's second request for reconsideration. Final Decision, 60 Fed. Cl. at 570.

Following the entry of final judgment, PGBA timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

ANALYSIS

I.

We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion. Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1379 (Fed. Cir. 2000); see also Int'l Rectifier Corp. v. Samsung Elecs. Co., 361 F.3d 1355, 1359 (Fed. Cir. 2004). "An abuse of discretion may be established under Federal Circuit law by showing that

the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." Int'l Rectifier, 361 F.3d at 1359 (citing Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 772 (Fed. Cir. 1993)). A clear error of judgment in weighing the relevant factors is shown when "we are left with a 'definite and firm conviction' that the court below committed a clear error of judgment." Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 917 (Fed. Cir. 1984) (citation omitted). Similarly, "[a] finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (quoting Maritrans Inc. v. United States, 342 F.3d 1344, 1350-51 (Fed. Cir. 2003)). PGBA raises several issues on appeal; we address them in turn.

II.

The Court of Federal Claims exercised jurisdiction in this case pursuant to 28 U.S.C. § 1491(b), which was enacted as part of the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870. ADRA repealed former 28 U.S.C. § 1491(a)(3) and added section 1491(b). Section 1491(b) provides in relevant part as follows:

> (1)    [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . .

> (2)    To afford relief in such an action, the court[] may award any relief that the court considers proper, including

declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3)    In exercising jurisdiction under this subsection, the court[] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4)    In any action under this subsection, the court[] shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C. § 1491(b) (2004).  Section 706 of title 5, which is part of the Administrative Procedure Act ("APA"), Pub. L. No. 89-554, 80 Stat. 378 (1966), provides in relevant part as follows:

The reviewing court shall—
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

PGBA's first argument on appeal is that once the Court of Federal Claims found TMA's award of TDEFIC to WPS to be arbitrary, capricious, and prejudicial to PGBA, it was required, pursuant to section 1491(b)(4) of title 28 and section 706(2)(A) of title 5, to set aside the award without regard to the balance of hardships.  According to PGBA, section 1491(b)(2) simply provides the Court of Federal Claims with the authority to grant injunctive relief.  Continuing, PGBA argues that interpreting section 1491(b)(4) to allow courts to exercise discretion after arbitrary and capricious conduct has been found, as the Court of Federal Claims did, would render section 1491(b)(3) superfluous. That is because, PGBA reasons, section 1491(b)(3)'s instruction to consider matters of national defense and national security before reaching judgment would be unnecessary if courts already had discretion in deciding whether to issue injunctive relief.

PGBA argues that we have never held that the Court of Federal Claims has discretion with respect to setting aside arbitrary and capricious contract awards. In addition, PGBA cites Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1998), and Disabled American Veterans v. Secretary of Veterans Affairs, 327 F.3d 1339, 1343, 1353-54 (Fed. Cir. 2003), in support of its argument that in 5 U.S.C. § 706, "shall means shall" and that, consequently, courts do not have discretion to decide whether to set aside arbitrary and capricious government action. Finally, PGBA explains that its interpretation of the statutory language is consistent with the legislative history. According to PGBA, in ADRA Congress enacted section 1491(b) in order to give the Court of Federal Claims Scanwell jurisdiction over bid protests and thereby eliminate the discretion district courts had historically exercised under Scanwell in determining whether to set aside arbitrary and capricious awards.[4]

The government and WPS (collectively, "defendants") respond that the Court of Federal Claims correctly read section 1491(b)(4) as incorporating the arbitrary and capricious standard of review of 5 U.S.C. § 706(2)(A), not its mandate that a "reviewing court shall . . . set aside agency action . . . found to be arbitrary [and] capricious." Defendants argue that this interpretation is consistent with section 1491(b)(2), which

---

[4]    In Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), the Court of Appeals for the District of Columbia Circuit held that the APA provides for review of agency procurement decisions in federal district court. "Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Under Scanwell, if a contract award was determined to be improper, injunctive relief did not issue as a matter of course. Rather, courts considered other relevant factors, such as the public interest in granting injunctive relief. See B.K. Instrument, Inc. v. United States, 715 F.2d 713, 730 (2d Cir. 1983).

gives the Court of Federal Claims discretion in fashioning relief. Defendants disagree with PGBA's argument that such a reading would render section 1491(b)(3) superfluous. According to defendants, section 1491(b)(3) is simply a "superpriority" provision, which instructs courts to give extra consideration to issues of national defense and national security before reaching judgment in a case. Defendants argue that their interpretation is consistent with well-settled jurisprudence recognizing equitable discretion in fashioning relief in bid protest cases, see, e.g., Cincinnati Elecs. Corp. v. Kleppe, 509 F.2d 1080, 1089 (6th Cir. 1975); William F. Wilke, Inc. v. Dep't of the Army, 485 F.2d 180, 182 (4th Cir. 1973); M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1302 (D.C. Cir. 1971), and that there is no evidence that Congress intended to change the law when it enacted section 1491(b)(4). Finally, defendants state that we have not previously held that courts have discretion in fashioning relief in bid protest cases simply because we have never questioned "the established equitable practice of the trial court." (Br. for Appellee-U.S. at 13.)

The parties' contentions frame the issue well. The question before us is whether the reference in 28 U.S.C. § 1491(b)(4) to 5 U.S.C. § 706 merely incorporates the arbitrary and capricious standard of review from section 706(2)(A), or whether it means that the reviewing court must set aside any action it finds arbitrary or capricious without consideration of the relative harms of such action. For the reasons which follow, we agree with the government and WPS that section 1491(b)(4) only incorporates the standard of review of section 706(2)(A) and therefore does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate. We thus hold

that, in a bid protest action, section 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.

First, we think that the plain language of section 1491(b)(4) supports this interpretation. The statute states that "courts shall <u>review</u> the agency's decision pursuant to the <u>standards</u> set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4) (emphasis added). This indicates that courts are to employ the <u>standards</u> of 5 U.S.C. § 706 in <u>reviewing</u> an agency decision. The statute does not say anything, however, about <u>remedying</u> agency decisions found to be unlawful. Section 706(2)(A) of title 5, in turn, provides two standards: a standard for <u>relief</u>—"The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions . . . ;" and a standard of <u>review</u> for determining when to apply the required relief—"found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In short, when read together, sections 1491(b)(4) and 706(2)(A) compel the conclusion that section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A).

This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive "may," provides the Court of Federal Claims with discretion in fashioning relief. Interpreting section 1491(b)(4) as requiring the court to enjoin all agency decisions found to be arbitrary, capricious, an abuse of discretion, or otherwise unlawful, would read the discretionary language out of section 1491(b)(2) by effectively rewording the statute to read:

> Courts may award any relief that the court considers proper, including declaratory and injunctive relief<u>, except that the court must issue an injunction setting aside the contract, and</u>

04-5101                                          12

> except that any monetary relief shall be limited to bid preparation and proposal costs.

Additionally, interpreting the statute as allowing discretion does not render 28 U.S.C. § 1491(b)(3) superfluous. See Hibbs v. Winn, 124 S.Ct. 2276, 2280, 159 L.Ed.2d 172 (2004) ("[T]he rule against superfluities instructs courts to interpret a statute to effectuate all its provisions, so that no part is rendered superfluous."). Defendants correctly explain that section 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief.

Nor is our interpretation inconsistent with this court's precedent. As noted by PGBA, several of our decisions have quoted the mandatory "shall-set-aside" language of 5 U.S.C. § 706. See, e.g., Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004); R & W Flammann Gmbh v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001). However, none of these decisions directly address the issue of whether an award that is found arbitrary and capricious must be set aside. This likely explains why we have not always used mandatory language when referring to the standard of review for bid protests. See Impresa, 238 F.3d at 1332 ("Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if . . . ." (emphasis added)); see also Emery, 264 F.3d at 1085 (explaining that Impresa correctly "stated that a bid award may be set aside if . . . ." (emphasis added)). Our interpretation is also consistent with decisions of the Court of Federal Claims. See, e.g., Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003) (stating that, before a permanent injunction will issue, a party must show "(1) it has

succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest").

PGBA cites to decisions of other circuits, as well as to Federal Circuit decisions outside the bid protest context, to support its contention that the word "shall" in 5 U.S.C. § 706 requires the reviewing court to issue an injunction once it has found arbitrary and capricious conduct on the part of the procuring agency.  These decisions are inapposite, however.  Forest Guardians, from the Tenth Circuit, concerned 5 U.S.C. § 706 as applied through the Endangered Species Act, not ADRA.  174 F.3d at 1186-91.  In addition, the case related to section 706(1), not to the standard of review from section 706(2)(A) relevant to bid protest cases.[5]  Similarly, Disabled American Veterans involved the issue of judicial review of regulations of the Department of Veterans Affairs pursuant to 38 U.S.C. § 502.  327 F.3d at 1341.  Section 502 of title 38 states that judicial review "shall be in accordance with chapter 7 of title 5."  This is a broad incorporation of chapter 7 of title 5.  This case involves a much narrower incorporation, specifically section 706(2)(A) of title 5 in connection with bid protest actions.

Finally, there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA.  Prior to January 1, 2001, district courts exercised concurrent jurisdiction with the Court of Federal Claims over government contract procurement challenges under Scanwell jurisdiction.  See Emery Worldwide, 264 F.3d at 1078-79; Impresa, 238 F.3d

---

[5]        Section 706(1) does not address arbitrary and capricious agency conduct.  Rather, it speaks to the situation in which an agency has improperly failed to act.  It provides that the "reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

at 1331. In 1996, however, Congress amended the Tucker Act by enacting ADRA. In addition to section 1491(b)(4), the amending statute contained a sunset provision which gave the Court of Federal Claims exclusive jurisdiction over bid protests on January 1, 2001. ADRA, Pub. L. No. 104-320, § 12(d), 110 Stat. at 3875; see also Emery Worldwide, 264 F.3d at 1079. The legislative history indicates that, by giving the Court of Federal Claims exclusive jurisdiction (and thereby abolishing Scanwell jurisdiction), Congress intended to increase the uniformity of bid protest and government contract law. See 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen) (explaining that ADRA "is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims" and to increase the uniformity of the law and reduce forum shopping). Although it abolished Scanwell jurisdiction in an effort to create uniformity, nothing indicates Congress intended to eliminate the Court of Federal Claims' discretion in deciding whether to issue injunctive relief. See Impresa, 238 F.3d at 1332 ("Under the ADRA, all bid protest actions under the APA are now reviewed under the standards applied [by district courts] in the Scanwell line of cases.").

### III.

PGBA next argues that even if the Court of Federal Claims did not err in its construction of 28 U.S.C. § 1491(b)(4), it did err in treating PGBA's action as one for injunctive rather than declaratory relief. The Court of Federal Claims determined that PGBA's requested relief "amount[ed] to a prayer for injunctive relief because [it] would bar WPS and the government from going forward with the TDEFIC as awarded and effectively mandate a new round of solicitation, proposals, evaluations, and a new

contract award." Initial Decision, 60 Fed. Cl. at 220. PGBA argues that this characterization ignored its claim for declaratory relief. PGBA's motivation for distinguishing between declaratory and injunctive relief appears to be a desire to avoid the equitable calculus associated with injunctive relief. (Br. for Appellant at 34 (explaining that WPS was "entitled to have TMA's action set aside and declared invalid without having to meet the injunctive tests").) Defendants counter that PGBA is asking to have the award set aside, which is coercive and has the same practical effect as an injunction.[6]

We agree with the government and WPS that the nature of the relief sought by PGBA was injunctive. PGBA's complaint requested that the Court of Federal Claims declare the award to WPS "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;" that the court issue "an order setting aside the award of the TDEFIC to WPS;" and that the court grant whatever other relief it deemed appropriate. The Court of Federal Claims determined that TMA acted arbitrarily and capriciously in awarding the contract to WPS. In addition, it awarded PGBA its bid preparation and proposal costs. PGBA still claims that it is entitled to further relief in the form of an order setting aside the award and thereby stopping performance by TMA and WPS under TDEFIC. This is tantamount to a request for injunctive relief. See, e.g., Samuels v.

---

[6] "The [United States Supreme Court] has recognized that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other." Steffel v. Thompson, 415 U.S. 452, 469, 94 S.Ct. 1209, 1221 (1974) (citations omitted). For example, "irreparable injury must be shown in a suit for an injunction, but not in an action for declaratory relief." Perez v. Ledesma, 401 U.S. 82, 123, 91 S.Ct. 674, 696 (1971); Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464 (1937). A declaratory judgment is also generally less coercive because it "is merely a declaration of legal status or rights," whereas an injunction either mandates or prohibits particular conduct. Ledesma, 401 U.S. at 124, 91 S.Ct. at 696.

Mackell, 401 U.S. 66, 71-73, 91 S.Ct. 764, 767-68 (1971) (explaining that when "the practical effect of the two forms of relief will be virtually identical," the "propriety of declaratory and injunctive relief should be judged by essentially the same standards"); Md. Citizens for a Representative Gen. Assembly v. Governor of Md., 429 F.2d 606, 611 (4th Cir. 1970) ("A declaratory judgment is not available as an academic exercise, and the coercive effect of one here would encounter all of the objections to injunctive relief."). The Court of Federal Claims properly viewed PGBA's suit as an action for injunctive relief. It therefore did not err in looking to the traditional equitable factors in determining whether to set aside award of the contract to WPS.

IV.

PGBA's final argument on appeal is that even if its request for a declaration setting aside the award to WPS was properly viewed as a request for injunctive relief, the Court of Federal Claims abused its discretion in withholding such relief. In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. See Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 1404 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

The Court of Federal Claims denied PGBA's request for injunctive relief in its original decision on March 31, 2004, as well as in its denial of PGBA's first request for reconsideration. Initial Decision, 60 Fed. Cl. at 220-23. On May 6, 2004, in response to PGBA's second request for reconsideration, the court held an evidentiary hearing in order to create a complete record regarding the consequences of granting or denying injunctive relief. Final Decision, 60 Fed. Cl. at 568 n.1. Based largely on testimony from this evidentiary hearing, the court denied PGBA's request for injunctive relief and entered final judgment on May 12, 2004. Id. at 568-69. The court relied on testimony from Brian Rubin, a government official with TMA, who testified as to the harms to TMA, WPS, and the public, if the court disrupted the TDEFIC transition schedule. Id. at 569-70. Mr. Rubin stated that WPS had incurred significant expenses in preparing for the transition and that setting aside the award would require TMA to reimburse WPS for these expenses. He also stated that altering the transition schedule would necessarily create substantial administrative burdens for TMA. Although Mr. Rubin believed the risk of actual disruption of claims processing was relatively low,[7] he testified that altering the transition schedule would likely create confusion among both beneficiaries and health care providers. The court also concluded that, even with PGBA's expertise in processing claims, setting aside the contract and awarding it to PGBA would result in a delay of approximately four to six weeks. Finally, the court considered PGBA's failure to seek a preliminary injunction as a factor weighing against a grant of injunctive relief.

---

[7] Mr. Rubin testified that there was a low risk of disruption for claims processed electronically. However, he believed there was a high risk of disruption for the comparatively small number of claims processed on a paper basis. Final Decision, 60 Fed. Cl. at 569.

PGBA argues that the court erred in its assessment of the relative harms and public interests associated with the determination as to whether injunctive relief should be granted. With respect to the relative harms, PGBA argues the court overstated the harm to TMA by failing to recognize that TMA exacerbated the harm by impermissibly accelerating TDEFIC's nine-month transition schedule. PGBA maintains that TDEFIC requires a nine-month transition period and that, while the first region (11) was originally set to transition on April 1, 2004, the automatic stay associated with PGBA's protest before the GAO shifted the first transition date back by approximately three months. By continuing to abide by the original transition schedule, PGBA contends, TMA manipulated the schedule by accelerating the transition date in order to tip the balance of harms in its favor. PGBA similarly contends that WPS would not have suffered the harm it claims if WPS had not continued to prepare for the transition in violation of Judge Allegra's preliminary injunction. Moreover, PGBA asserts that ultimately WPS will not incur any costs because it will be able to recover its reasonably incurred termination-for-convenience costs from the government.

PGBA contends that the Court of Federal Claims further erred by understating the harms to PGBA associated with denying injunctive relief. PGBA explains that allowing TMA and WPS to continue performance of the contract will result in PGBA losing the opportunity to make a profit as well as significant employee layoffs. PGBA also asserts that it was error for the court to consider PGBA's decision not to seek a preliminary injunction in its balance of harms calculus. PGBA states that it certainly would have sought a preliminary injunction had it known TMA would manipulate the transition schedule and that WPS would violate Judge Allegra's preliminary injunction.

PGBA also argues that it is in the public interest to set aside an arbitrary and capricious award of a $487 million contract and that, for a variety of reasons, the court erred in ruling otherwise. First, PGBA contends the court erred by failing to consider TMA's alternative options for processing claims during a reevaluation or resolicitation. In particular, PGBA explains that either extending claims processing under the MCS contracts or entering into sole source contracts would have ensured continued processing of claims pending the award of a new TDEFIC. PGBA further argues that the court failed to even consider the viability of a reevaluation as opposed to a resolicitation.[8] Second, PGBA contends that the court overstated the risk of disruption of claims processing resulting from setting aside the contract. PGBA notes that Mr. Rubin testified that disruption to beneficiaries would be minimal. Additionally, PGBA argues that, at the time of the court's decision on May 6, 2004, the risk of confusing beneficiaries was overstated, considering that only region 11 had transitioned and that the notices of the upcoming June 1, 2004 transitions for regions 2 and 5 were not to be mailed until the following week of May 11, 2004. Finally, PGBA urges that the low number of dual eligible beneficiaries in region 11 further indicates a relatively low risk of disruption associated with setting aside the award to WPS, especially considering PGBA is an incumbent contractor and would have only needed thirty to sixty days to transition to the TDEFIC system.

For their part, the government and WPS argue that the evidence supports the Court of Federal Claims' decision and that PGBA has failed to point to anything in the

---

[8] According to PGBA, the difference between a reevaluation and resolicitation could be significant in the relative harms calculus because a reevaluation could have been conducted within a matter of weeks, whereas a resolicitation could take substantially more time.

record amounting to an abuse of discretion. WPS explains that while it is true that various remedies, such as a reevaluation, were available, the court found that such remedies would unduly burden TMA and WPS and also carried associated risks to beneficiaries. The government contends that what PGBA labels as "mistakes" by the Court of Federal Claims are actually just instances where PGBA disagrees with the weight the court attributed to various factors in its equitable calculus. The defendants also dispute PGBA's assertions that they impermissibly accelerated the contract and that WPS violated Judge Allegra's preliminary injunction. WPS states that TMA did not impermissibly accelerate the contract but merely maintained the original schedule for transition of region 11 on April 1, 2004. In any event, WPS asserts, while the contract allowed for a nine-month transition, it did not require a nine-month transition. WPS also asserts that it did not violate Judge Allegra's preliminary injunction, but merely undertook contract preparation activities at its own risk.

Defendants also argue that PGBA did not come forward with evidence it would suffer irreparable harm, such as evidence of lost profits or evidence that a monetary award would not remedy its damages if a resolicitation or reevaluation was not ordered. Moreover, WPS argues that PGBA's claim of irreparable harm is significantly diminished by its failure to seek a preliminary injunction at the outset of the lawsuit.

As an initial matter, we reiterate that our review is limited to the question of whether the Court of Federal Claims abused its discretion in withholding injunctive relief. We do not find an abuse of discretion absent a "showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." Int'l Rectifier, 361 F.3d at 1359

(citation omitted). PGBA has not shown that the Court of Federal Claims based its decision on an error of law or a clearly erroneous finding of fact. Therefore, we will not disturb the Court of Federal Claims' decision absent a showing that the court made a "clear error of judgment" in weighing the relevant factors. The evidence does not leave us with a "definite and firm conviction" that the court made such an error. We consequently affirm the court's decision.

First, the record does not indicate the Court of Federal Claims clearly erred in judging the potential harm to TMA and WPS associated with issuing an injunction. The court specifically addressed PGBA's argument that TMA could mitigate its harm by extending the existing MCS contracts pending resolution of a reevaluation or resolicitation. The court found that, while possible, extension of the MCS contracts would create their own unique administrative burdens for TMA, such as reprinting notices to beneficiaries and consulting with appropriate members of Congress and the military. Final Decision, 60 Fed. Cl. at 569. The record from the evidentiary hearing of May 6, 2004 further details these administrative burdens. Hearing at 46-48 (explaining the complexities of halting transition under TDEFIC and extending the MCS contracts); id. at 54 (explaining how TMA would have to reverse all of the transition activities that had already taken place); id. at 55 (explaining how TMA would have to negotiate with WPS regarding WPS's incurred transition costs); id. at 56 (explaining that websites and other publications would need to be redone). Therefore, while it may have been possible to conduct a reevaluation within a matter of weeks, the record indicates that the complexity of extending the old MCS contracts while awaiting a reevaluation would have burdened TMA substantially. WPS too, the court found, had incurred substantial

costs in preparing for the transition to TDEFIC.[9]  Final Decision, 60 Fed. Cl. at 569 (explaining how WPS and TMA had already developed a computer system for processing claims and payment requests).

As noted, the court relied heavily on the testimony of Mr. Rubin, a government official with TMA.  Final Decision, 60 Fed. Cl. at 569.  Mr. Rubin's testimony supports defendants' position that TDEFIC does not require but, rather, merely allows for a nine-month transition period.  Hearing at 37.  Mr. Rubin also testified that TMA issued a stop-work order to WPS after Judge Allegra issued the preliminary injunction.  Id. at 34-36.  Mr. Rubin stated that any work undertaken between the time WPS received the stop-work order and the removal of the injunction was unilateral and undertaken at WPS's own risk.  Id. at 36, 38.  In sum, the record does not reflect a manipulation of the transition schedule by TMA or WPS, nor does it reflect a misunderstanding of the transition schedule by the Court of Federal Claims.  Therefore, we do not think the record supports PGBA's contention that the Court of Federal Claims overstated the harm to TMA and WPS.

Second, the record also does not reflect a clear error in the court's assessment of the potential harm to the public of issuing injunctive relief.  The court acknowledged that setting aside the award posed a low risk of actual disruption of claims processing.  Final Decision, 60 Fed. Cl. at 569.  However, the court explained that Mr. Rubin

---

[9]  We note that it is not evident from the record when exactly WPS incurred its various costs.  To the extent WPS incurred costs while under Judge Allegra's preliminary injunction order, they were incurred at WPS's own risk and are irrelevant to the balance of harms analysis.  For purposes of this decision, suffice it to say that not all of WPS's costs were incurred during the period of the preliminary injunction, as the injunction was only in effect for about two months—from September 15, 2003 to November 17, 2003.  See Initial Decision, 60 Fed. Cl. at 202; Order.

believed there was a substantial risk of disruption for the relatively small number of claims processed on a paper basis. Additionally, while the overall risk of disruption was relatively low, the court explained that the risk of confusion of beneficiaries and health care providers was high. Id.; see also Hearing at 56 (explaining that, even for the electronic claims, there was a significant risk of confusion in the event TMA transitioned back to the old MCS contracts). Mr. Rubin also testified that even though PGBA had experience processing claims, the delay associated with setting aside the award and then awarding the contract to PGBA would still be about four to eight weeks. Final Decision, 60 Fed. Cl. at 569. The court also explained how transitioning PGBA to TDEFIC would result in more burdens to TMA. Id. (explaining that TMA would still have to "benchmark" PGBA's computer system).

In short, PGBA has not pointed to any evidence in the record leaving us with the definite and firm conviction that the Court of Federal Claims erred in withholding injunctive relief. PGBA does not argue that the trial court based its decision on an error of law or on clearly erroneous findings of fact. PGBA has also not shown that the court made a clear error of judgment in weighing the relevant injunction factors. Rather, PGBA's arguments on appeal effectively ask this court to reweigh the relative harms and public interest factors and find in its favor. Such discretionary decisions are properly left to the trial court's sound judgment. Therefore, finding no clear error in the Court of Federal Claims' judgment in this case, we affirm the denial of injunctive relief.

CONCLUSION

In sum, we decide the issues before us as follows:

(1)     Because 28 U.S.C. § 1491(b)(4) only incorporates the standard of review of 5 U.S.C. § 706(2)(A), the Court of Federal Claims had discretion in determining whether to set aside a bid award determined to be arbitrary, capricious, and prejudicial to PGBA.

(2)     The Court of Federal Claims did not err in determining that PGBA's action was in the nature of a claim for injunctive relief.

(3)     Finding no abuse of discretion, we affirm the Court of Federal Claims' decision to withhold injunctive relief and not set aside the award of the contract to WPS.

COSTS

Each party shall bear its own costs.

AFFIRMED