# United States Court of Appeals for the Federal Circuit

———————————

**LIFE SCIENCE LOGISTICS, LLC,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2024-1522

———————————

Appeal from the United States Court of Federal Claims in No. 1:23-cv-02116-ZNS, Judge Zachary N. Somers.

———————————

Decided: April 15, 2026

———————————

DANIEL HAY, Sidley Austin LLP, Washington, DC, argued for plaintiff-appellee.  Also represented by WILLIAM R. LEVI.

EVAN WISSER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant.  Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, DOUGLAS K. MICKLE.

———————————

Before MOORE, *Chief Judge*, STARK, *Circuit Judge*, and OETKEN, *District Judge*.[1]

STARK, *Circuit Judge*.

The government appeals from a judgment of the Court of Federal Claims declaring that an agency's decision to override an automatic statutory stay of performance of a newly awarded contract was arbitrary and capricious. Appellee Life Science Logistics, LLC ("LSL") contends that the government's appeal is moot and we should, therefore, dismiss it for lack of jurisdiction. In the alternative, LSL asks us to affirm the trial court on the merits. We conclude that the exception to mootness for disputes that are capable of repetition yet evading review is applicable here, giving us jurisdiction to reach the merits. Doing so, we agree with the Court of Federal Claims. Thus, we affirm.

I

The Strategic National Stockpile ("SNS") is a nationwide network of facilities for the storage and deployment of medicines, vaccines, and medical supplies. The SNS is managed by the Administration for Strategic Preparedness and Response, an agency within the Department of Health and Human Services.

Since 2007, LSL has operated multiple SNS sites pursuant to contracts awarded by the General Services Administration ("GSA"). Today, LSL holds more SNS contracts than any other entity. Each contract, the last of which expires in the early 2030s, is worth millions of dollars and runs for many years.

In 2011, LSL was awarded a 10-year contract to service the SNS warehouse in the National Capitol Region

---

[1]    Honorable J. Paul Oetken, District Judge, United States District Court for the Southern District of New York, sitting by designation.

("NCR"), an area that includes New York, Philadelphia, Baltimore, and Washington, D.C.  LSL received satisfactory or better performance evaluations for its work under the NCR contract.  In 2021, the NCR contract expired.  At that point, the government and LSL agreed to an extension running through December 25, 2023 (the "Bridge Contract"), which the government had the option to extend by one month.

In May 2022, shortly after the parties agreed to the Bridge Contract, the government issued a bid solicitation for a new 10-year contract to manage the NCR SNS facility ("NCR Contract").  LSL submitted a bid, as did one of its competitors, Integrated Quality Solutions LLC ("IQS").  Like LSL, IQS has been awarded other SNS contracts; it is currently the second largest player in the market, with contracts running into the 2030s.  Servicing the SNS is IQS's primary line of business.

In August 2022, GSA awarded the NCR Contract to IQS.  LSL filed a "written objection" (a "protest") to the award with the Government Accountability Office ("GAO").  *See* 31 U.S.C. § 3551(1).  Subsequently, after additional solicitations, bids, awards, and protests, IQS was awarded the NCR Contract a second and, finally, a third time, the latter occurring on October 30, 2023.  On November 20, 2023, LSL protested the third award by again filing an objection with GAO.

LSL's latest protest triggered an automatic stay under the Competition in Contracting Act ("CICA"), which prevented GSA and IQS from beginning performance under the NCR Contract while GAO evaluated LSL's protest, a period that could last, by statute, up to 100 days.  *See id.* § 3553(d)(3)(A)(i) ("If the Federal agency awarding the contract receives notice of a protest . . . the contracting officer may not authorize performance of the contract to begin while the protest is pending."); *see also id.* § 3554(a)(1) ("[T]he Comptroller General shall issue a final decision

concerning a protest within 100 days after the date the protest is submitted."). On December 7, 2023, however, only a few weeks into the stay period, GSA decided to override the stay pursuant to a different provision of CICA. *See id.* § 3553(d)(3)(C). In support of the override, GSA issued a Determination and Findings ("D&F"), in which it found that "urgent and compelling circumstances now exist that significantly affect the interests of the United States and do not permit waiting for the GAO decision in the protest," and that "it is in the best interest of the United States to override the mandatory stay of performance and authorize IQS to being performance of the Awarded [NCR] Contract." J.A. 246, 252.

Six days later, on December 13, 2023, LSL filed suit in the Court of Federal Claims, alleging that the override was unlawful because the D&F's reasoning was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). As relief, LSL requested a declaratory judgment or, alternatively, an injunction reimposing the CICA stay.

The Court of Federal Claims reviewed the case expeditiously. On December 21, 2023, the court held a hearing, at the conclusion of which it ruled in favor of LSL, issuing a declaratory judgment that the override was arbitrary and capricious. In reaching that conclusion, the court rejected the government's contention that LSL was required to prove an entitlement to injunctive relief under the four equitable factors traditionally governing preliminary injunction motions, i.e., likelihood of success on the merits, irreparable harm, balance of the equities, and the public interest. The court explained:

> In creating the CICA stay, Congress decided that injunctive relief factors need not be invoked when a bid protest is timely filed with the GAO, instead requiring that contract performance be stayed automatically. . . . To allow an arbitrary override

> decision to insert the injunctive relief requirements into this process would convert the CICA stay into something other than what Congress created.

J.A. 107.

On February 17, 2024, the government timely appealed. Ten days later, on February 27, 2024, GAO sustained LSL's most recent protest, leading GSA to withdraw the override. *See Matter of: Life Sci. Logistics, LLC*, No. B-421018.4 et al., 2024 WL 982583, at \*12 (Comp. Gen. Feb. 27, 2024).

## II

"The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction [over] . . . an appeal from a final decision of the United States Court of Federal Claims." 28 U.S.C. § 1295(a)(3). "We review the Court of Federal Claims decisions de novo for errors of law and for clear error on findings of fact." *Sys. Fuels, Inc. v. United States*, 818 F.3d 1302, 1305 (Fed. Cir. 2016). "We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion." *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1375 (Fed. Cir. 2024) (internal quotation marks omitted). "An abuse of discretion exists where the Court of Federal Claims made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 991 (Fed. Cir. 2018) (internal quotation marks omitted).

## III

We must first determine whether we have jurisdiction to consider the government's appeal. The parties agree that the specific dispute that existed when this appeal was filed in February 2024 – whether the Court of Federal Claims' declaratory judgment that GSA's override of the

CICA stay relating to the award of the NCR Contract to IQS was arbitrary and capricious – became moot shortly thereafter, when the government withdrew the override. LSL argues that this undisputed mootness means we lack jurisdiction and must dismiss this appeal. We disagree. Instead, we agree with the government that the issue presented in this appeal is capable of repetition yet may otherwise evade review and, accordingly, falls within a well-established exception to the mootness doctrine.

## A

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "A corollary to this case-or-controversy requirement is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted). Without a live case or controversy, a lawsuit typically becomes moot, and Article III courts lack jurisdiction to hear it. *See eSimplicity, Inc. v. United States*, 122 F.4th 1373, 1376 (Fed. Cir. 2024) ("A case should generally be dismissed as moot when, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue.") (internal quotation marks and alterations omitted).

A well-settled exception to the mootness doctrine arises when the parties' dispute is capable of repetition but is also, because of time constraints, likely to evade judicial review. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 169 (2016). "A dispute qualifies for th[is] exception only if (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same

action again." *United States v. Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (internal quotation marks omitted).

We agree with the government that the merits issue here – whether judicial reversal of a government override of a CICA stay can occur without a bid protestor demonstrating that equitable relief is warranted under the four-factor test – is capable of repetition yet evading review.

## B

### 1

We have already determined that issues relating to overrides of a CICA stay meet the "evading review" requirement. *See NIKA Techs., Inc. v. United States*, 987 F.3d 1025, 1027 (Fed. Cir. 2021). CICA stays, as well as overrides of such stays, are limited by statute to a maximum duration of 100 days. This is due to the interaction of three provisions in CICA: (i) § 3554(a)(1), requiring GAO to decide a bid protest within 100 days; (ii) § 3553(d)(3)(A)(i), staying performance of the awarded contract during GAO review; and (iii) § 3553(d)(3)(C), allowing the contracting agency to override the automatic stay during the pendency of GAO review. In *NIKA*, 987 F.3d at 1027, we recognized that litigating a CICA dispute "in 100 days is unrealistic, if not impossible," because "a party has at most 100 days for proceedings at the Court of Federal Claims," and then "to file an appeal with this court, and for this court to consider and decide the case." During that brief window of time, "the underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration." *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1318 (Fed. Cir. 2025) (internal quotation marks omitted).

The Supreme Court recently made essentially the same point when it explained that "three months [is] a period too short to complete judicial review." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 671 n.1 (2025) (internal quotation

marks omitted) (allowing case to proceed under "capable of repetition yet evading review" exception). Earlier, in *Kingdomware*, 579 U.S. at 170, the Supreme Court similarly held, in the specific context of government contract disputes, that even "a period of two years is too short to complete judicial review of the lawfulness of [a government] procurement." Thus, a protestor's challenge to a CICA stay, as well as the government's appeal of a judicial order relating to an agency's override, are issues "evading review."

2

The second requirement for the mootness exception, "whether there is a reasonable expectation that the party invoking review here will run into this same problem again," is satisfied as well. *NIKA*, 987 F.3d at 1028. The party seeking review in this case is the government. Since "[t]he government will be involved in all future bid protests," "there is a reasonable expectation that the government will be subject to the same action again," i.e., a judgment that an agency override of a CICA 100-day stay is arbitrary and capricious, without factoring in the traditional equitable considerations. *Id.* (internal quotation marks and alterations omitted). As the government points out, "the standard for setting aside a CICA stay override will be relevant to every CICA stay override dispute." Reply Br. at 11.

Both parties read our opinion in *NIKA*, which relied on the Supreme Court's reasoning in *Kingdomware*, as holding that the "capable of repetition" requirement is not satisfied based merely on evidence that the same dispute is reasonably likely to come up again between the government and some *other* bidder; it must be reasonably likely to arise again between the government and *LSL in*

*particular. See, e.g.*, Oral Arg. at 3:35-50[2] (Government counsel: "So as we understand the relevant Supreme Court precedent, primarily *Kingdomware*, in the context of bid protests especially, it's that there has to be some showing of a likelihood of recurrence between the two named parties."); *id.* at 22:41-45 (LSL counsel: "As all agree, it has to be a dispute between these same parties."); *see also* Open. Br. at 14; LSL Br. at 16. We have no occasion today to question this proposition, as the record fully supports the government's contention that this same dispute *is* reasonably likely to recur between the government and LSL.

LSL is the largest player in "an unusually tight market" that currently consists of only three participants: LSL, IQS, and a third party. J.A. 251. These three regularly compete for all SNS contracts. Each SNS contract runs for years and is worth millions of dollars. As the government observes, "there are often very few viable options for an SNS facility in a given region because of the strict geographic, safety, and conditioning requirements." Open. Br. at 14 (citing J.A. 2369-77).

Hence, it is a near certainty that LSL will bid on future SNS contracts, including, as is the case here, contracts to continue operating SNS sites at which LSL is the incumbent provider. This is vividly illustrated by the fact that LSL bid on the renewal of the NCR Contract three times. It is likewise a near certainty that LSL will, if not selected as the winning bidder, protest an award to one of its competitors, as it did three times here. It is, then, entirely reasonable to expect that the government and LSL will spar over an agency override of a CICA stay again in the future.

Thus, the circumstances presented here are far more similar to those in *Kingdomware*, 579 U.S. at 170, where

---

[2] Available at https://www.cafc.uscourts.gov/oral-arguments/24-1522_12032025.mp3.

the Supreme Court found no mootness because the dispute was reasonably likely to recur between the government and a contractor who "ha[d] been awarded many previous contracts," *id.*, than they are to the "considerably more tenuous scenario" we confronted in *Safeguard Base Operations, LLC v. United States*, 792 F. App'x 945, 948 (Fed. Cir. 2019), where the protestor "ha[d] never received a federal contract." The government's reliance on *Safeguard* is therefore unavailing.

In sum, because the issue the government raises is capable of repetition yet evading review, we have jurisdiction to reach the merits of this appeal.

## IV

Turning to the merits, we conclude that the Court of Federal Claims did not err when it granted declaratory relief without first evaluating whether LSL met the traditional four-factor test for preliminary injunctions. A bid protestor seeking a declaration that an agency override of a CICA stay is arbitrary and capricious need only show that, in fact, the agency's override was arbitrary and capricious. The protestor is not also required to demonstrate a likelihood of success on the merits, irreparable harm, a balance of the equities in its favor, and a benefit to the public. *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1036-37 (Fed. Cir. 2009) (noting difference between arbitrary and capricious standard and four-factor injunction test).

## A

We begin with the text and structure of CICA. When an "actual or prospective bidder" with a "direct economic interest" is not selected for a government contract, it may file a written protest with GAO. 31 U.S.C. §§ 3551(2)(A), 3552. "A protest concerning an alleged violation of a procurement statute or regulation shall be decided by the Comptroller General," i.e., the head of GAO. *Id.* § 3552(a).

"Within one day after the receipt of a protest, the Comptroller General shall notify the Federal agency involved of the protest." *Id.* § 3553(b)(1). Then, subject to exceptions not pertinent here, "the Comptroller General shall issue a final decision concerning a protest within 100 days after the date the protest is submitted." *Id.* § 3554(a)(1).

A protest "trigger[s] an automatic stay under [CICA], prohibiting [the agency] from awarding [or authorizing performance of] a new contract pending a decision on the protest." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1287 (Fed. Cir. 1999); *see also* 31 U.S.C. § 3553(c)(1) ("[A] contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending."); *id.* § 3353(d)(3)(A)(i) ("[T]he contracting officer may not authorize performance of the contract to begin while the protest is pending."). Because CICA requires the Comptroller General to resolve the protest within 100 days, the stay of performance of the protested contract can last only up to 100 days. *See id.* § 3554(a)(1).

"CICA, however, also allows an agency to override the automatic stay." *RAMCOR*, 185 F.3d at 1287. Specifically, as pertinent here, CICA sets out that:

> The head of the procuring activity [within the agency awarding a contract] may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section) –
>
> (i)     upon a written finding that –
>
>> (I) performance of the contract is in the best interests of the United States; or
>>
>> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for

> the decision of the Comptroller General concerning the protest; and
>
> (ii)    after the Comptroller General is notified of that finding.

31 U.S.C. § 3553(d)(3)(C).

Although CICA does not expressly provide for judicial review of an agency's exercise of this override authority, we recognized in *RAMCOR*, 185 F.3d at 1290, that such review is available pursuant to the Tucker Act.[3]  To be precise, a protestor whose entitlement to an automatic 100-day CICA stay has been overridden by the awarding agency may file a complaint in the Court of Federal Claims, alleging that the override decision is arbitrary and capricious in violation of the APA.  *See* 28 U.S.C. § 1491(b)(1) ("[Courts] shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."); *id.* § 1491(b)(4) ("[T]he courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and

---

[3]    *RAMCOR* involved an agency override of a "pre-award" CICA stay, which the agency undertook pursuant to 31 U.S.C. § 3553(c) (relating to contract awards that, absent a stay, are "otherwise likely to occur within 30 days"), rather than, as here, an exercise of override authority in the "post-award" context governed by 31 U.S.C. § 3553(d). Neither party suggests that this distinction has any impact on the reviewability of the CICA stay override at issue here.

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

Thus, in conjunction with the Tucker Act and the APA, CICA sets out the following "Procurement Protest System," 31 U.S.C. § 3551, *et seq.*:

(1) an agency may award a contract to an eligible bidder;

(2) an interested party may file a protest;

(3) upon the filing of such a protest, a CICA stay is automatically triggered and lasts up to 100 days;

(4) the agency, upon making certain findings, may override the stay and proceed with performance of the contract; and

(5) the protestor may then file an APA claim in the Court of Federal Claims challenging the override as an arbitrary and capricious government action.

The parties' dispute relates to step 5 and the standards to be applied by the Court of Federal Claims in reviewing a protestor's APA claim. As we elaborate below, we agree with LSL that a bid protestor need only prove that the agency decision was arbitrary and capricious; it need not also prove the four factors of the traditional equitable relief test.

## B

In CICA, Congress prescribed exactly what is to occur when an interested party, like LSL, protests a contract award to another bidder, such as IQS. First, Congress established a default rule: CICA imposes an automatic stay of 100 days to allow GAO to evaluate the protest before the contract may be implemented. *See* 31 U.S.C. § 3553(d)(3)(A)(i). Second, Congress set out a single

exception to that default: the procuring agency may override the stay if it finds that "performance of the contract is in the best interests of the United States" or that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting." *Id.* § 3553(d)(3)(C)(i). If a court determines that the government's override is arbitrary and capricious, that agency action is a nullity and the default rule – i.e., the automatic stay – is reimposed.

There is no place in this statutory regime for courts to superimpose the judge-made four-factor test governing equitable relief as an additional burden on the protestor. Congress explicitly imposed *no burden whatsoever* on the protestor in CICA; rather, the simple filing of a written protest "trigger[s] an *automatic* stay." *RAMCOR*, 185 F.3d at 1287 (emphasis added). It cannot have been Congress' intent to require a protestor whose automatic stay has been overridden by arbitrary and capricious government action to have to prove to a court – in addition to the unlawfulness of the override – that the protestor faces irreparable harm, the equities are in its favor, and the public would benefit from granting the relief requested. None of CICA, the Tucker Act, or the APA reference any of these traditional equitable factors. We will not read into this congressional silence an unexpressed intent to require protestors to prove all of them.

In making this determination, we are mindful of the adverse consequences that might arise were we to decide otherwise. Were we to hold that a protestor must, even to obtain a declaration that an override is unlawful, prevail on the four-factor test, we would undesirably incentivize the government to override more (if not all) CICA stays. In that scenario, as LSL aptly puts it, "the government could simply override the stay for no reason at all and then push the burden to the bidder to make a full four-factor showing for equitable relief." LSL Br. at 4. Imposing this greater, non-statutory burden would assuredly doom more protests,

an outcome that would sit uncomfortably next to Congress' express choice to provide protestors an *automatic* stay for 100 days by doing nothing more than filing a protest.

C

In urging us to reach the opposite conclusion, the government insists that the declaratory judgment the Court of Federal Claims granted LSL is "coercive," and has the same practical effect as a preliminary injunction. Open. Br. at 17. Thus, says the government, LSL must satisfy the four factors of the traditional equitable relief test. In support of its position, the government relies heavily on our decision in *PGBA, LLC v. United States*, 389 F.3d 1219, 1227-28 (Fed. Cir. 2004). We are not persuaded.

In *PGBA*, which did not involve CICA, we found that a bid protestor's request for a declaratory judgment was "tantamount to injunctive relief" because the protestor was "asking to have the award set aside, which is coercive and has the same practical effect as an injunction." *Id.* at 1228 ("[T]he nature of the relief sought by PGBA was injunctive."). The specific remedies the *PGBA* protestor sought were (i) a "declaratory judgment that [the agency's] *decision to award* the Contract to [the third-party bidder] is arbitrary, capricious, [and] an abuse of discretion," and (ii) "an order *setting aside the award*." *Id.* at 1222 (emphasis added).

Here, by contrast, the relief granted to LSL was merely a declaration that *the override* is arbitrary and capricious based on the reasoning contained in the D&F. J.A. 106 ("[T]he D&F was arbitrary and capricious and [therefore] LSL, the Protestor, is entitled to declaratory relief."); J.A. 109 ("[T]he determination to override the automatic stay imposed under CICA lacks a reasonable basis."). Even LSL's alternative request for an injunction sought only to "enjoin[] performance of the contract awarded to IQS . . . until the GAO issues a ruling on LSL's GAO protest." J.A. 234. LSL did not ask for, and the Court of Federal Claims

did not grant, either a declaration or injunction vacating the *contract award* to IQS.  Nor did the court order that the contract be awarded outright to LSL.  These are material distinctions from the circumstances we considered in *PGBA*.

Additionally, and importantly, unlike in *PGBA*, any purportedly "coercive" impact from the declaratory judgment here was the result of CICA, not the court's judgment itself.  That is, the Court of Federal Claims' order here did not compel the government to take or refrain from taking any action; it instead simply restored the default statutory stay.  As the court well stated, "[i]n CICA override cases, . . . declaratory relief is not tantamount to an injunction because there is no coercive action on the part of the Court. . . .  [Instead,] [b]y operation of law, the automatic stay in [LSL's] GAO protest is reinstated."  J.A. 108-09.  Our holding today, then, is entirely consistent with *PGBA*.

In short, we agree with the Court of Federal Claims that it is not necessary for a bid protestor to satisfy the four-factor equitable relief test in order to overcome an arbitrary and capricious government override of an automatic CICA stay.

## V

Accordingly, for the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

## AFFIRMED

## COSTS

Costs to LSL.