# In the United States Court of Federal Claims

No. 13-378C

(Filed Under Seal: September 17, 2013)
(Reissued: September 25, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| **BCPEABODY CONSTRUCTION SERVICES, INC.,** | ) ) ) | Post-award bid protest; best-value |
|  | ) | negotiated procurement conducted |
| **Plaintiff,** | ) | under FAR Part 15; a procurement |
|  | ) | official's discretion to seek clarification |
| **v.** | ) | of minor or clerical errors in offers; |
|  | ) | FAR § 15.306(a)(2); abuse of discretion |
| **UNITED STATES,** | ) |  |
|  | ) |  |
| **Defendant,** | ) |  |
|  | ) |  |
| **and** | ) |  |
|  | ) |  |
| **EDENS CONSTRUCTION CO., INC.,** | ) |  |
|  | ) |  |
| **Defendant-Intervenor.** | ) |  |
|  | ) |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

James E. Krause, Jacksonville, Florida, for plaintiff.

Elizabeth Anne Speck, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Carolyn J. Fox, Assistant District Counsel, United States Army Corps of Engineers, Jacksonville, Florida.

William L. Bruckner, San Diego, California for defendant-intervenor.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information. The resulting redactions are marked by asterisks enclosed by brackets, e.g., "[\*\*\*]."

LETTOW, Judge.

This post-award bid protest concerns a contract awarded by the Department of the Army, United States Army Corps of Engineers, Jacksonville District ("the Corps" or "the government"), for construction of a cutoff wall through abandoned culverts, placement of a drainage blanket, re-pavement of a dike crown, and completion of other ancillary work in Okeechobee County, Florida. The project was a small-business set aside, conducted as a competitive negotiated procurement subject to the Federal Acquisition Regulations ("FAR"), 48 C.F.R. Part 15. The contract was awarded to defendant-intervenor Edens Construction Co., Inc. ("Edens"). BCPeabody Construction Services, Inc. ("BCPeabody"), a bidder for the contract, protests the award. On June 21, 2013, the court granted plaintiff's motion for preliminary injunction, barring the government from proceeding with the award made to Edens. *See BCPeabody Constr. Servs., Inc. v. United States*, No. 13-378C, 2013 WL 3225844 (Fed. Cl. June 21, 2013). Immediately thereafter, the court adopted an accelerated schedule of proceedings for resolution of this case. Now pending before the court are the government's motion for judgment on the administrative record ("Def.'s Mot."), ECF No. 37, Edens's corresponding motion for judgment on the administrative record, ECF No. 38, BCPeabody's cross-motion for judgment on the administrative record, ("Pl.'s Cross-Mot."), ECF No. 39, and the government's motion to correct the administrative record, ECF No. 48. BCPeabody contends that the Corps did not treat all offerors fairly and equally and that the contracting officer acted unreasonably when she failed to clarify an alleged clerical mistake in its bid proposal before rejecting the proposal as technically unacceptable.

## FACTS[2]

### A. Solicitation

The solicitation at issue, No. W912EP-13-R-0001, called for proposals to complete construction work for the Herbert Hoover Dike Rehabilitation Project, Culvert 7, Culvert 9, and Taylor Creek Abandonment in Okeechobee County, Florida. AR 2-56.[3] The Corps's

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), as well as from the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] [c]ourt, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

[3]Citations to the administrative record refer to the record filed on June 19, 2013. That record is paginated sequentially and also divided into tabs. In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 2-56 refers to page 56, which is located in tab 2 of the record.

Jacksonville District issued the solicitation pursuant to FAR § 15.101-2, *i.e.*, invoking a "[l]owest price, technically acceptable source selection process." AR 2-73. The solicitation stated that the "[g]overnment intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR § 15.306(a))." AR 2-65. The solicitation listed two factors the Corps would evaluate in awarding the contract: (1) Technical Acceptability and (2) Price. AR 2-74. The Technical Acceptability factor was split into two sub-factors: (a) Demonstrated Experience and (b) Past Performance. *Id.* In turn, the Demonstrated Experience sub-factor contained two sub-elements: (i) Cutoff Wall Experience and (ii) Earthen Embankment Experience. AR 2-75. If an offeror received a rating of unacceptable for either sub-element, the offeror would necessarily receive a rating of unacceptable for both the Demonstrated Experience and Past Performance sub-factors of Technical Acceptability, and its offer consequently would be rejected as technically unacceptable. AR 2-76 to -78.

To receive a rating of acceptable for the sub-elements of Cutoff Wall Experience and Earthen Embankment Experience, the bidders were required to submit project information sheets for each sub-element to demonstrate that the offeror and its subcontractors had experience performing the type of work requested in the solicitation. AR 2-75 to -76. One of the projects submitted for the Cutoff Wall Experience had to include work "penetrating, excavating, and backfilling through an obstruction that could not be removed by a typical backhoe or excavator during cutoff wall construction." AR 2-75.

### B. Evaluation of Offers and Award

The Corps received timely proposals from five firms, including BCPeabody and Edens. BCPeabody's proposal identified Bauer Foundation Corporation ("Bauer") as its major subcontractor for the Cutoff Wall Experience sub-element and provided an unconditional letter of commitment from Bauer stating that "[Bauer] will fulfill the duties of Cutoff Wall Installation for the [project]" should BCPeabody receive the contract. AR 4-707. Although BCPeabody's proposal included two project information sheets demonstrating that Bauer had experience in performing cutoff wall construction, AR 4-708 to -11, the two sheets were identical. BCPeabody mistakenly included two copies of the same project information sheet regarding Bauer's work. *Id.* The submitted project information sheets did not supply the necessary experience regarding cutoff wall construction in which a sub-surface obstruction was encountered that could not be removed by a typical backhoe or excavator. AR 9-941.[4] Because of the missing project information sheet, BCPeabody received a rating of unacceptable for Cutoff Wall Experience. AR 9-942.

Regarding the second sub-element, Earthen Embankment Experience, BCPeabody supplied an information sheet relating to its own work, and it received a rating of acceptable for that sub-element. AR 13-973 to -74. Nonetheless, due to the rating of unacceptable for the

---

[4]BCPeabody had been fully aware of the solicitation requirements and had requested the appropriate project information sheets from Bauer, including one that would demonstrate its experience penetrating, excavating, and backfilling through an obstruction that could not be removed by a typical backhoe or excavator during cutoff wall construction. AR 14-985.

3

Cutoff Wall Experience sub-element, it received a rating of unacceptable for the Demonstrated Experience sub-factor. AR 9-942. As a result, it also received a rating of unacceptable for Past Performance. *Id*. BCPeabody's offer was considered to be technically unacceptable by the contracting officer, and she excluded it from the competition. *Id*. The technical rating process and the determination that BCPeabody should be found technically unacceptable occurred without alerting BCPeabody to the mistake in its proposal. BCPeabody's proffered price was $3,699,326.26. AR 4-736.

Edens's proposal was the only proposal deemed technically acceptable, AR 9-946, and Edens was awarded the contract on December 21, 2012. AR 10-948. Like BCPeabody's, Edens's proposal contained a letter of commitment from Bauer to "fulfill the duties of Cutoff Wall Installation for the [project]" in the event the contract was awarded to Edens. AR 5-772. In addressing both sub-elements of the Demonstrated Experience sub-factor, Edens did not use project information sheets as required by the solicitation. AR 9-944. Nonetheless, it provided sufficient details about projects completed to receive a rating of acceptable for the sub-factor. *Id*. For the Cutoff Wall Experience sub-element, Edens supplied information about two projects completed by Bauer. *See* AR 9-943 to -44. The contracting officer thus knew that Bauer had the requisite experience to perform the cutoff wall construction under either of the conditions specified in the two sub-elements. Edens's price quote was $4,783,688.00, more than $1,000,000 greater than the price put forward by BCPeabody. AR 5-923.

[***] offerors relied on Bauer as a major subcontractor. AR 9-938 to -44. Nothing in BCPeabody's or Edens's proposals indicated an intention to rely on any other subcontractor for the cutoff wall construction. The proposals by BCPeabody and Edens were identical in that respect, as were the commitment letters from Bauer that each had appended to its proposal. The contracting officer indicated that she knew that BCPeabody intended to rely on Bauer for the cutoff wall construction: "Based on BCPeabody's proposal, it was clear that BCPeabody intended to use Bauer as the subcontractor for the cut-off wall." AR 19c-1046.

But for the unacceptable rating that BCPeabody received for Cutoff Wall Experience due to its omission of a second project information sheet demonstrating Bauer's experience with an underground obstruction, it would have had the lowest priced, technically acceptable bid. The other three offerors, [***], were all found technically unacceptable, but unlike BCPeabody, they were found unacceptable for both the Cutoff Wall Experience and the Earthen Embankment Experience sub-elements. AR 9-934.[5]

## C. Protests

Following notification that Edens had received the contract and that BCPeabody's proposal was found to be technically unacceptable, AR 11-950, BCPeabody requested a debriefing from the contracting officer, which it received on January 9, 2013. *See* AR 14-980.

_____

[5]Two offerors provided project information sheets from Bauer and owned subsidiaries of Bauer to demonstrate the necessary experience for the Cutoff Wall Experience sub-element. Providing project information sheets from owned subsidiaries of Bauer created separate problems for those two offerors. *See* AR 9-938 to -44.

BCPeabody first learned of the copying error from the debriefing. BCPeabody immediately filed an agency level protest on January 10, 2013. AR 14-976.

As part of its protest, BCPeabody argued that the government abused its discretion by failing to inquire about the collating mistake it made regarding information sheets concerning Bauer's cutoff wall experience. *See* AR 14-979 to -80. The agency denied BCPeabody's protest, concluding that the contracting officer had no obligation either to clarify the mistake or to draw any inferences or make any assumptions regarding BCPeabody's proposal. AR 15-1002, 1004. BCPeabody then filed a protest with the Government Accountability Office ("GAO") on February 21, 2013. AR 19q-1280. BCPeabody maintained its argument that the contracting officer abused her discretion in failing to clarify the alleged clerical mistake, given her knowledge that BCPeabody planned to use Bauer as the major subcontractor and her knowledge that Bauer was well-qualified to perform the work. *See* AR 24-1455; *see also BCPeabody Constr. Servs., Inc.*, B-408023, 2013 CPD ¶ 120, 2013 WL 1944164, at *3 (Comp. Gen. May 10, 2013).

GAO disagreed with the agency's conclusion that the contracting officer did not abuse her discretion. It found that "[a]lthough an offeror has the burden of submitting an adequately written proposal, and an agency may downgrade a proposal for the lack of requested information, an agency may not ignore prior performance information of which it is aware." AR 24-1456; 2013 WL 1944164, at *4 (citing *Consolidated Eng'g Servs., Inc.*, B-279565.2, .3, 99-1 CPD ¶ 75, 1998 WL 1045204, at *4 (Comp. Gen. June 26, 1998)). Because the Corps's contracting officer was aware of Bauer's experience from other proposals, including especially that by Edens, she could not reasonably find Bauer's experience acceptable for Edens but unacceptable for BCPeabody. *Id.* ("Here, the proposals of both Edens and BCPeabody included [Bauer] as their respective cut-off wall construction subcontractor, and it was not reasonable for the Corps to find [Bauer's] experience acceptable for Edens but unacceptable for BCPeabody.").

GAO nonetheless denied BCPeabody's protest, finding that it was not prejudiced by the contracting officer's error. AR 24-1457; 2013 WL 1944164, at *4. BCPeabody had included with its briefing to GAO a project information sheet completed by Bauer Foundations Canada, a separate legal entity from Bauer. That affiliated entity was not covered by Bauer's letter of commitment to BCPeabody, and therefore the protest was denied. AR 24-1457; 2013 WL 1944164, at *5.

Thereafter, BCPeabody filed suit in this court on June 6, 2013. Compl., ECF No. 1. BCPeabody moved for a preliminary injunction on June 11, 2013 to bar the Corps from proceeding with the contract. *See* Pl.'s Mot. for Preliminary Injunction, ECF No. 18. A hearing was held on June 21, 2013, and the court granted the motion the same day. *See* Order Granting Mot. for Preliminary Injunction, 2013 WL 3225844, ECF No. 29. All parties subsequently filed and briefed cross-motions for judgment on the administrative record, and a hearing was held on July 23, 2013. Subsequently, to support an argument the government had fleshed out and elaborated in its reply brief on the merits, the government filed a post-hearing Motion to Correct the Administrative Record, ECF No. 48, to add to the record proposals submitted by offerors other than BCPeabody and Edens. Briefing on that motion was completed on August 12, 2013.

**JURISDICTION**

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3784 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)). In pertinent part, the Tucker Act vests this court with jurisdiction to

> render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A party can show the existence of a "direct economic interest" by demonstrating that it had a "substantial chance" of winning the award. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (internal citations omitted). "[A] bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract." *ST Net, Inc. v. United States*, __ Fed. Cl. __, __, (2013), 2013 WL 4128730, at *5 (citing *G4S Tech. CW LLC v. United States*, 109 Fed. Cl. 708, 719 (2013)).

BCPeabody is an "interested party" within the terms of the Tucker Act and has standing to pursue its protest. BCPeabody submitted a bid for the award at issue and contends that only it and Edens submitted technically acceptable offers. Because it had the lower price by more than $1,000,000, BCPeabody would have had a substantial chance of winning the contract.[6]

**STANDARDS FOR DECISION**

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's review of a challenge to an agency's contract award. *See* 28 U.S.C. § 1491(b)(4) ("In any action under

---

[6]The government does not argue that BCPeabody's copying and collating mistake prevented BCPeabody from having standing to challenge the contracting officer's determinations about its offer, and, indeed, any argument against standing would have been unavailing. *See ST Net*, __ Fed. Cl. at __, 2013 WL 4128730, at *6 (citing *Orion Tech.*, 704 F.3d at 1349 (commenting that criticality of missing information is "relevant to the reasonableness of the [agency's] decision-making, not to determining prejudice for standing purposes"); *MVS USA, Inc. v. United States*, 111 Fed. Cl. 639, 648-49 (2013) (holding that a protestor whose allegation that the disqualifying flaw in its proposal was due to improper government action had standing to challenge award); *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 523 (2011) (concluding that a protestor had pled sufficient facts to raise a question whether government properly deemed its proposal to be late had standing to challenge award)).

this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). For that proposition, BCPeabody rests on the potentially viable legal position that it should have been given notice of its mistake in copying information about Bauer's experience and been given the opportunity to correct the mistake. The court may set aside an agency's procurement decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, subject to satisfying the criteria for equitable relief, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004). To find that an agency's decision was arbitrary, capricious, or an abuse of discretion, the court must conclude that the "decision lacked a rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The court "is not empowered to substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (*abrogating Overton Park* to the extent that it recognized the APA as an independent grant of subject matter jurisdiction)), and it must uphold an agency's decision against a challenge if the "contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal citations omitted).

## ANALYSIS

### I. Clarification and Unequal Treatment

BCPeabody contends that the contracting officer erred by failing to seek clarification of a clerical mistake in its proposal and by unequally evaluating Bauer's demonstrated experience as a subcontractor for BCPeabody compared to Edens. BCPeabody avers that these actions were unreasonable and fell outside the reconcilable bounds of the contracting officer's discretion.

#### A. A Procuring Official's Authority Regarding Clerical Errors

Procurement officers have authority to act regarding clerical errors in bid proposals, but that authority varies depending on the type of procurement at issue – *i.e.*, sealed bidding or negotiated procurement. Where sealed bids are concerned, the rules regarding clerical and other mistakes in offers are cast in mandatory terms. FAR Part 14 governs sealed bidding and provides generally that "[in] cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer *shall* request from the bidder a verification of the bid, calling attention to the suspected mistake." FAR § 14.407-1 (emphasis added). Regarding "[a]pparent clerical mistakes," the contracting officer "shall obtain from the bidder a verification of the bid intended" and attach it to the original bid. FAR § 14.407-2(a)-(b). Respecting other mistakes disclosed before award, "[s]uspected or alleged mistakes in bids shall be processed as follows[:] . . . . The contracting officer shall immediately request the bidder to verify the bid. Action taken to verify bids must be sufficient to reasonably assure the contracting officer that the bid as confirmed is without error, or to elicit the allegation of a mistake by the bidder." FAR § 14.407-3(g)-(g)(1). In instances where the low bidder seeks to correct the bid but would remain the lowest bidder, the existence of the mistake and the bid actually intended must be established by "clear and convincing evidence." FAR § 14.407-3(a). The closer the corrected bid comes to the next lowest bid, the greater the scrutiny

7

that will be applied to the evidence of the mistake and the intended bid. In cases where the corrected bid would be lowered enough to displace another bid as the lowest bid, a stricter standard applies. Both the mistake and the intended bid must be "ascertainable substantially from the invitation and the bid itself." FAR § 14.407-3(a).

For procurements governed by FAR Part 14, GAO has allowed use of mistake-correction techniques to enable nonresponsive bids to become responsive, applying the stricter standard to correct bids which displace otherwise low bids. As stated in John Cibinic, Jr., Ralph C. Nash, Jr., & Christopher R. Yukins, *Formation of Government Contracts* 649 (4th ed. 2011),

> Most cases involving correction of nonresponsive bids have involved invitations containing a number of bid items where bidders have incorrectly entered or omitted prices for one or more of the items. In *Slater Elec. Co.*, Comp. Gen. Dec. B-183654, 75-2 CPD ¶ 126, GAO dealt with this kind of situation, stating: "Basically, even though a bidder fails to submit a price for an item in a bid, that omission can be corrected if the bid, as submitted, indicates not only the probability of error but also the exact nature of the error and the amount intended. The rationale for this exception is that where the consistency of the pricing pattern in the bidding documents establishes both the existence of the error and the bid actually intended, to hold that the bid is nonresponsive would be to convert what appears to be an obvious clerical error of omission to a matter of nonresponsiveness."

*Id.* (internal citations omitted).

In contrast to the mandatory instructions in FAR Part 14 for handling mistakes discovered before award in sealed bidding situations, the regulatory provisions regarding mistakes discovered before award in bids for negotiated procurements are largely discretionary. FAR § 15.306(a)(1)-(2) allows clarification of certain aspects of proposals or to resolve minor or clerical errors without the initiation of "discussions."[7] Specifically, FAR § 15.306(a)(2) provides that

> "[i]f award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors."

---

[7]Once discussions are initiated for a solicitation governed by FAR Part 15, discussions must be entered into with all offerors whose proposals fall within a competitive range. *See*, *e.g.*, FAR § 15.306(a)(3), (b)-(e).

*Id.* Clarifications are defined as "limited exchanges, between the [g]overnment and offerors, that may occur when award without discussions is contemplated." FAR § 15.306(a)(1). The FAR does not define "minor or clerical errors."

The original FAR Part 15, issued in 1984, defined "discussions" to include "information essential for determining the acceptability of a proposal." FAR § 15.601 (1997). Revisions to FAR Part 15 in 1997 deleted this definition of "discussions," which was viewed as too constraining, in favor of allowing "as much free exchange of information between offerors and the [g]overnment as possible, while still permitting award without discussions and complying with applicable statutes. . . . This policy is expected *to help offerors, especially small entities* that may not be familiar with proposal preparation, *by permitting easy clarification of limited aspects of their proposals*." 62 Fed. Reg. 51224, 51228-29 (Sept. 30, 1997) (emphasis added).

While the line between "clarification" and "discussion" is not always easy to demarcate, some core concepts appertain. Changes to the terms of an offer made in a proposal cannot be considered a clarification. John Cibinic, Jr., Ralph C. Nash, Jr., & Karen R. O'Brien-DeBakey, *Competitive Negotiation: The Source Selection Process* 508 (3d ed. 2011). As Cibinic, Nash and O'Brien-DeBakey explain, information exchanges that do not concern changes to the terms of offers may be appropriate in the clarification process: "[I]t is useful to distinguish between information concerning the capability of the offeror and information relating to the features of the offer. Whereas the former should clearly be clarifications under FAR [§] 15.206(a), past decisions dealing with information relating to the offer make inclusion of this type of communication more problematic." *Id.* at 509; *see also Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003) (reviewing the regulatory history of the revisions to Part 15 in 1997 regarding clarification and holding that communications for the purpose of obtaining additional information about subcontractors listed in the offeror's proposal constituted clarifications rather than discussions); *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 539 (2013) ("[Although, in a clarification, the winning offeror] may have provided the [a]gency with required information that was not included in its proposal, the court does not find that [the offeror] revised its proposal because [it] did not change its total price and did not 'change the terms of its proposal to make it more appealing to the government.'" (quoting *Information Tech & Applications*, 316 F.3d at 1322)).

Despite the intention that the revisions to Part 15 in 1997 would enable more information to be exchanged between the government and offerors without reaching the level of discussions, the revisions stopped short of requiring contracting officers to clarify minor or clerical errors in negotiated procurements, unlike the mandatory nature of the comparable provisions in Part 14 for sealed bidding. Consequently, a fairly sharp divide remains between the clarification rules in Part 15 for negotiated procurements and the mandatory nature of comparable provisions in Part 14 for sealed bidding. For negotiated procurements, clarifications are to be obtained at the discretion of the contracting officer. [8] Nonetheless, the permissive language of the clarification

---

[8]Where contracting officers exercised their discretion to seek clarifications, but did not go so far as to engage in "discussions," the court has tended to uphold the contracting officers' actions. *See Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 44-45 (2010), *aff'd*, 649

provisions in Part 15 does not mean that those provisions are not susceptible to judicial enforcement.

## B. BCPeabody's Error

BCPeabody alleges that the duplication of the same project information sheet regarding Bauer's experience with cutoff wall installation was a copying error in assembling its offer. Pl.'s Cross-Mot. at 2. BCPeabody concedes that a contracting officer has discretion in clarifying such clerical errors, but argues that, given the particular circumstances associated with its proposal, it was unreasonable for the contracting officer to fail to do so. *Id.* The government responds that the copying error was not a clerical error, and even if it were, the contracting officer was under no duty to inquire into it. Def.'s Mot. at 7. According to the government, BCPeabody's proposal was incomplete, and the contracting officer had unqualified discretion to reject it as technically unacceptable. *Id.*

The government goes too far in arguing that BCPeabody's mistake was a "major omission that made it impossible for the agency to fully evaluate BCPeabody's [p]roposal." Def.'s Mot. at 7. The record shows that the proposal, taken as a whole, could be properly evaluated despite the error. The contracting officer knew that BCPeabody intended to rely on Bauer as the subcontractor for the cutoff wall construction, that Bauer had the requisite experience to perform the work, and that BCPeabody mistakenly submitted two identical project information sheets respecting Bauer's experience. The circumstances are thus closely akin to those at issue in *Information Tech. & Applications* and *Mil-Mar Century* where "clarifications" provided essential information about a subcontractor and contractor, respectively, but did not alter or revise the terms of the pertinent offers. *See Information Tech. & Applications*, 316 F.3d at 1322; *Mil-Mar Century*, 111 Fed. Cl. at 539.

By contrast, in *ST Net*, the protestor had omitted material pricing information. *See ST Net*, __ Fed. Cl. at __, 2013 WL 4128730, at *8. Had the protestor included the requisite pricing items, its total evaluated price would have increased by roughly 7%. *Id.* Under those circumstances, it was impossible for the agency accurately to evaluate the protestor's proposal, and the court accordingly held that the omission was not a clerical error. *Id.* at __, 2013 WL 4128730, at *10. In the instant case, the omitted project information sheet did not bear on price or involve information that the contracting officer did not already know. Inclusion of a second project information sheet would not have materially altered the terms of BCPeabody's offer. It only addressed Bauer's suitability as a subcontractor, and the contracting officer was well aware that Bauer was a qualified subcontractor. The court consequently is satisfied that BCPeabody's mistake constituted a clerical error within the meaning of FAR § 15.306(a)(2), a matter that could have been the subject of inquiry by the contracting officer without provoking discussions.

## C. The Contracting Officer's Discretion

---

F.3d 1320 (Fed. Cir. 2011); *see also Dyncorp Int'l, LLC v. United States*, 76 Fed. Cl. 528, 540 (2007).

Undoubtedly, the language of FAR § 15.306(a)(2) is permissive, and a contracting officer has discretion in determining whether to seek clarification. Whether that discretion is absolute and whether an agency's actions must be reasonable and rational are at issue here. The question at hand focuses on the extent to which competitive negotiation is so far removed from sealed bidding that a contracting officer's reaction to a clerical mistake can be diametrically different in the two types of procurement, despite factually comparable and compelling circumstances for clarification.[9]

The government points to *Orion Technology*, 704 F.3d 1344, as precedent for the proposition that it is within an agency's unqualified discretion to reject a technically incomplete proposal. *See* Def.'s Mot. at 7, 12-13. In *Orion*, the protestor submitted a proposal on the last possible day and omitted proprietary cost information for five of its eight subcontractors. *Orion*, 704 F.3d at 1346. Eight days later, the soliciting agency received the missing subcontractor data, but refused to consider it. *Id*. The protestor's proposal was subsequently rejected because, without the subcontractor data, the agency could not perform a cost-realism analysis of the proposal. *Id*. at 1346-47. The court of appeals held that it was within the agency's discretion to reject the belatedly submitted information and to exclude the proposal because it could not perform the necessary cost-realism analysis. *Id*. at 1351. As in *ST Net*, the protestor's omission in *Orion* was material and prevented the soliciting agency from accurately evaluating the proposal. The technical incompleteness in BCPeabody's proposal does not rise to that level. BCPeabody's mistaken omission did not impair the contracting officer's ability to evaluate BCPeabody's fitness or price quote for the contract.

---

[9]A knowledgeable commentator has questioned whether the standards for correction of minor or clerical errors should be sharply divergent between the two types of procurements. *See* Ralph C. Nash, 27 No. 9 Nash & Cibinic Rep., *Correcting Mistakes: Negotiation v. Sealed Bidding*, ¶ 41 (Sept. 2013) ("[W]e can't see how the [g]overnment would be harmed by adopting a mandatory verification and mistake correction rule when competitive negotiation is the procurement technique. When the [g]overnment uses long and complex solicitations, mistakes can be expected. It would seem that both parties would benefit from a rule that compensates for such mistakes. Companies that spend the money required to compete in these circumstances would be given fair treatment and the agencies would have a better chance of awarding to the offeror(s) that really can deliver best value."). This sentiment was evident in the court's decision in *Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257 (2000), where the protestor's contact information for its insurance representative was missing from the proposal. The court held that the omission was clerical and that the contracting officer had a duty to inquire into it even though it was a negotiated procurement and not a sealed bid procurement. *Id.* at 259 ("In character it was the same as a sealed bid procurement where there are no post-submission contacts with bidders."). At the time of the solicitation, Griffy's was performing another contract for the Army, and the court reasoned that the Army could have easily discerned the contact information from its own files or called Griffy's. *Id*. at 260. The decision in *Griffy's Landscape* has been criticized for applying the criteria for correcting minor or clerical errors in sealed bidding situations to a negotiated procurement. *See C.W. Over & Sons, Inc. v. United States*, 54 Fed. Cl. 514, 521 (2002); *see also Camden Shipping Corp. v. United States*, 89 Fed. Cl. 433, 438 & n.5 (2009).

11

A prior decision by this court can be read to imply that a contracting officer's discretion under FAR § 15.306(a) is so broad that he or she would never have a duty to seek clarifications. In *Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338 (2004), the court held that a contracting officer did not abuse his discretion when, without explanation, he failed to clarify uncertainties in the protestor's past performance information even though the technical evaluation team reported that clarifications were "required" before a final evaluation could be made. *Id.* at 360-61. In describing FAR Part 15, the court wrote, "[W]henever the contracting officials think a clarification of certain aspects of a proposal would be helpful, they have the discretion to seek such a clarification, even when discussions with all bidders would not occur. The FAR allows, but does not require, such exchanges to take place." *Id.* at 360. Taken at face value, this court concurs with such a statement, but it cannot accept the implication that there are never situations in which a contracting officer's discretion would be abused by a failure to seek clarification.

This is particularly true where, as here, the clerical error led the contracting officer to evaluate the past performance of a subcontractor differently for two offerors. Contracting officers are required to "ensure that contractors receive impartial, fair, and equitable treatment." FAR § 1.602-2(b). In addressing BCPeabody's protest to GAO, that body pointed out that in a procurement, "an agency may not ignore prior performance information of which it is aware." AR 24-1456, 2013 WL 1944164, at *4 (citing *Consolidated Eng'g Servs., Inc.*, B-279565.2, 1998 CPD ¶ 75, 1998 WL 1045204, at *4 (Comp. Gen. June 26, 1998)). That principle applies here. Once the contracting officer became aware of the suitability of Bauer's past experience with cutoff wall construction, she could not reasonably rate Bauer differently for BCPeabody as contrasted to Edens. Given BCPeabody's significantly lower bid, the contracting officer had virtually overwhelming cause to contact BCPeabody about the clerical error or assign an equal rating for Bauer as a subcontractor for both Edens and BCPeabody.

The government argues that requiring the contracting officer to clarify the copying mistake in this case will "[obligate] the agency to correct each and every so-called 'clerical error' [and] create a paternalistic acquisition system that the drafters of the [FAR] rejected." Def.'s Mot. at 7. That argument amounts to a policy-based plea for the court to recognize an unreviewable discretion on the part of the contracting officer to omit inquiring about "minor or clerical errors." As suggested previously, that contention is legally unpersuasive and factually untenable on the record of this case. The contracting officer had all of the information she needed about BCPeabody's proposal, including all price information, and about Bauer's qualifications as a subcontractor.

In a last-ditch effort to sustain the contracting officer, the government makes a counter-factual contention that it was "fundamentally unclear" to the contracting officer "whether Bauer was the only major subcontractor that BCPeabody would use to perform the [subcontracted] work." Def.'s Reply at 6. The government points to two other offerors who proposed to use Bauer for cutoff wall construction but to do so along with other subcontractors, including Bauer Foundations Canada. *Id.*[10] This argument manifestly is a construct of counsel, not borne out by the record of the contracting officer's actions. The contracting officer excluded BCPeabody's

---

[10]In support, the government belatedly moved post-hearing to "correct" the record by including the proposals of other contractors.

12

proposal solely because it was lacking a second project information sheet, not because it was "fundamentally unclear" who BCPeabody intended to use as a subcontractor and whether that subcontractor had the requisite experience. Indeed, BCPeabody, like Edens, had included as part of its offer an unconditional commitment from Bauer that "[Bauer] will fulfill the duties of Cutoff Wall Installation for the [project]." AR 4-707. That commitment was categorical and unambiguous.

In short, BCPeabody has established that the contracting officer in this case abused her discretion in two ways. First, she impermissibly found Bauer, the projected subcontractor for both BCPeabody and Edens, to have acceptable experience insofar as Edens's proposal was concerned but not for BCPeabody's competing proposal. Second, she improperly refused to seek clarification from BCPeabody regarding the copying mistake in BCPeabody's offer that related to Bauer's experience in cutoff wall construction in which a sub-surface obstruction was encountered.

## II. Prejudice

To succeed on the merits, a bid protestor must show not only that there was an error in the procurement process but also that it was prejudiced by the error. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). In this respect, a protestor must demonstrate that there was a "substantial chance it would have received [the] contract award, but for the alleged error in the procurement process." *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 712 (2013) (quoting *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003) (in turn citing *Information Tech. & Applications*, 316 F.3d at 1319)); *see also Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). This inquiry into "prejudice" is distinct from the inquiry into standing. While both use the "substantial chance" doctrine, prejudice at the jurisdictional threshold can be satisfied on the basis of the plaintiff's allegations, whereas prejudice on the merits can only be satisfied by the effect of an agency decision adjudged to be unlawful. *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010).

BCPeabody has demonstrated that it was prejudiced by the contracting officer's abuse of discretion. If the contracting officer had acted reasonably in light of the facts and circumstances at hand, BCPeabody would have had a "substantial chance" of receiving the contract. BCPeabody would have been a technically acceptable bidder offering the lowest price by more than $1,000,000.

## III. Equitable Factors

To grant equitable relief which would set aside and enjoin the Corps's award of the contract to Edens, the court must consider "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds the injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

13

Looking at each factor in turn, BCPeabody has succeeded on the merits by showing that the contracting officer acted unreasonably by excluding BCPeabody's proposal from competition. She could have either clarified the clerical mistake or evaluated Bauer equally for both Edens and BCPeabody. The first factor weighs in favor of BCPeabody.

BCPeabody argues that it will suffer irreparable harm if it is denied injunctive relief because it will have been "denied a fair opportunity to compete under the solicitation and to benefit from a lawful procurement process." Pl.'s Mot. for Preliminary Injunction at 17. The government argues that neither denial of a fair opportunity to compete nor lost economic profits can constitute irreparable harm. Def.'s Reply at 26-27. The government inaccurately cites *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), for the proposition that denial of a fair opportunity to compete is not irreparable harm. *See* Def.'s Reply at 26-27. In *eBay*, the Supreme Court simply held there should be no presumption that permanent injunctions should issue in patent cases, and, instead, that such injunctions should be considered in accord with the generic four-factor test, just as in any other case. 547 U.S. at 394. The Supreme Court said nothing about denial of a fair opportunity to compete in the context of a bid protest. In contradiction to the government's second argument, the court has repeatedly held that the loss of potential profits from a government contract can constitute irreparable harm. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 520 (2012) (citing cases). In this instance, denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute irreparable harm.

The court must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to the Corps and to the awardee should the injunction be granted. *See PGBA*, 389 F.3d at 1231-32; *Gentex*, 58 Fed. Cl. at 654. Edens would suffer an economic hardship if the contract award is rescinded, but if BCPeabody is only awarded bid preparation costs, it would suffer a corresponding hardship. The government, however, has not indicated any special consequence to delaying contract award and reevaluating the proposals. There is no evidence that the construction work must be undertaken immediately to rectify a pressing problem. The government has not demonstrated that the balance of hardships should weigh in its favor.

It is well established that the public interest is well-served by ensuring that the government procurement process is fair and even-handed. *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219. The public has no urgent need for completion of the construction work and will not be harmed by a short delay while the Corps reevaluates proposals.

Considering all of the factors, the court finds that a permanent injunction barring the Corps from awarding the contract to Edens and requiring it to restore BCPeabody to the competition and reevaluate proposals is justified.

## CONCLUSION

For the reasons stated, BCPeabody's motion for judgment on the administrative record is GRANTED, as is BCPeabody's Motion for Permanent Injunction, ECF No. 47. The government's and Edens's motions for judgment on the administrative record are accordingly

14

DENIED. The Corps's award of the contract to Edens is set aside,[11] and the Corps is required to restore BCPeabody to the competition and to reevaluate the proposals that were submitted.[12]

The clerk is directed to issue a final judgment in accord with this disposition.[13]

Costs are awarded to plaintiff.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[11]This aspect of the decision has been amended to accord with the court's grant of defendant's motion to clarify the judgment, filed September 24, 2013.

[12]BCPeabody is relieved of the responsibility to maintain the security bond that it was required to post pursuant to RCFC 65(c), in connection with the issuance of the preliminary injunction.

[13]BCPeabody's Motion to File Affidavit in Support of Pl.'s Motion for Judgment on the Admin. Record, ECF No. 40, is GRANTED IN PART. The affidavit is taken into the record of the case but shall not be considered a supplement to the administrative record of the agency's actions in the procurement. The government's Motion to Correct the Administrative Record, ECF No. 48, is GRANTED.