# United States Court of Appeals for the Federal Circuit

---

**NATIONAL GOVERNMENT SERVICES, INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1927

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00200-MMS, Chief Judge Margaret M. Sweeney.

---

Decided: May 2, 2019

---

MATTHEW HILLEL SOLOMSON, Federal Government Solutions, Anthem, Inc., Baltimore, MD, argued for plaintiff-appellant. Also represented by MONICA ROSE STERLING, ANUJ VOHRA, Crowell & Moring, LLP, Washington, DC.

WILLIAM PORTER RAYEL, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE, JOSEPH H. HUNT.

---

Before PROST, *Chief Judge,* MOORE and WALLACH, *Circuit Judges.*

PROST, *Chief Judge.*

In this bid protest, National Government Services, Inc. ("NGS") appeals the decision of the Court of Federal Claims ("Claims Court") denying NGS's pre-award bid protest. *Nat'l Gov't Servs., Inc. v. United States*, 137 Fed. Cl. 715 (2018) ("*Decision*"). We reverse the decision of the Claims Court and remand for further proceedings.

I

The Centers for Medicare & Medicaid Services ("CMS") is an agency of the U.S. Department of Health and Human Services ("HHS"). CMS uses contractors to administer claims and benefits related to the Medicare program.

From the inception of Medicare in 1965 until implementation of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Modernization Act"), CMS procured contractors to administer Medicare claims and benefits through noncompetitive contracts. *Decision*, at 2. In the Medicare Modernization Act, however, Congress added Section 1874A to the Social Security Act (Title XVIII) to create the Medicare administrative contractor ("MAC") program. *See* Medicare Modernization Act, Pub. L. No. 108-173, § 911(a)(1), 117 Stat. 2066, 2378–83 (codified as amended at 42 U.S.C. § 1395kk-1 ("the MAC Statute")).

The companies that process Medicare claims on behalf of CMS are called Medicare administrative contractors or MACs. *See* 42 U.S.C. § 1395kk-1(a)(3). An "A/B" MAC provides services with respect to Medicare Parts A and B. *See* 42 U.S.C. § 1395kk-1(a)(4); *see also id.* §§ 1395h(a), 1395u(a). The MAC Statute generally requires CMS to "use competitive procedures when entering into contracts with [M]edicare administrative contractors

[MACs] under this section, taking into account performance quality as well as price and other factors." § 1395kk-1(b)(1)(A).

The nationwide MAC contract market is currently divided into twelve geographic jurisdictions: 5, 6, 8, and 15, plus E, F, H, and J–N. *Decision*, at 3. For example, Jurisdiction H represents 13.5% of the current A/B Medicare workload and covers Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, and Texas. Meanwhile, Jurisdiction 8 represents 5.9% of the current A/B Medicare workload and covers Indiana and Michigan. *Decision*, at 3. CMS solicits contracts for each jurisdiction.

B

In 2010, CMS began preparing for its second round of solicitations to replace the original A/B MAC contracts as they expired.[1] In July 2010, CMS issued a Request for Information ("RFI") that described changes to CMS's approach to the A/B MAC procurements and provided an opportunity for potential offerors to give input on those changes. One of CMS's proposed changes was to implement a contract award limit for the A/B MAC contracts to be included in all A/B MAC solicitations. J.A. 11465 (RFI). The purpose of this award limit was "to place a limit, in all A/B MAC Round II solicitations, on the amount of A/B MAC contract responsibility that any single entity can win . . . in a 'prime contractor' capacity." *Decision*, at 5 (quoting J.A. 11465 (RFI)).

In August 2010, CMS issued another RFI regarding this proposed award limitations policy ("Award Limitations Policy" or "Policy"). *See* J.A. 11472–82 (RFI). CMS indicated that this Policy would be included in all

---

[1]    Expiration of MAC contracts is staggered. *See Decision*, at 15 (listing the release date for the next solicitation in each jurisdiction).

solicitations for the second round of MAC contracts. *Decision*, at 9 (citing J.A. 11478). After making some revisions to the Policy, CMS included the Policy in the Jurisdiction F solicitation, which CMS issued in October 2010. According to the Policy, CMS would not award more than 26% of the national A/B Medicare workload to any single contractor or more than 40% of the national A/B Medicare workload to any one set of affiliates. *Decision*, at 10 (quoting the Jurisdiction F solicitation).

CMS designed the Award Limitations Policy to address two market concerns: (1) "business continuity concerns with awarding an overly-large share of the Medicare claims administration workload to any one entity (or set of affiliated entities)"; and (2) "maintain[ing] a dynamic, competitive marketplace, where no single entity (or set of affiliated entities) control/s so much of the agency's MAC business that all or most other players are driven from the market, returning the agency to a less-than-competitive environment." J.A. 11801 ¶ 7 (Klots Decl.).

C

CMS continued to incorporate the Award Limitations Policy into solicitations for other jurisdictions, including Jurisdiction H ("JH"). *See* J.A. 15546–48. As stated in the JH solicitation, the Policy explains:

CMS will not award more than 26% of the national A/B Medicare workload, in A/B MAC prime contracts, to any single contractor (single corporate entity). In addition, CMS will not award more than 40% of the national A/B Medicare workload, in A/B MAC prime contracts, to any one (1) set of affiliates.

CMS is placing no limitation on the number of A/B MAC prime contracts for which any entity, or entities, may submit proposals. As A/B MAC prime contracts are awarded, the awardee's Medicare

workload base will be appropriately adjusted, thereby potentially impacting other pending proposals.

J.A. 15546.[2]  The workload percentages assigned to each MAC jurisdiction are included in the solicitation. J.A. 15548.

The JH solicitation explains that "CMS will determine whether Offerors exceed the limitation on workload at the time of award, and will exclude Offerors from consideration on such basis at that time." J.A. 15547. Moreover, the solicitation includes an "Exception," which states:

In order to ensure continuity in Medicare Fee-for-Service operations, CMS retains the discretion to award a particular A/B MAC prime contract to a particular contractor, even where doing so would otherwise exceed the A/B MAC prime contract Medicare workload allowed by this policy.

J.A. 15548. We refer to this exception as the "Continuity Exception."

NGS is an offeror for the JH solicitation.[3]  NGS is also the current contractor for Jurisdiction 6 (which represents 7.8% of the current A/B Medicare workload), as well as Jurisdiction K (which represents 12% of the current A/B Medicare workload).  Based on the Award Limitations Policy

---

[2]     The same language was included in the Jurisdiction 8 solicitation.  *See* J.A. 10133–35.

[3]     At the time NGS filed its opening brief before this court, NGS was an offeror for Jurisdictions F, 8, and H.  No award decisions had been announced for those jurisdictions at that time.  Since then, however, the Jurisdiction F contract was awarded to a different MAC, and the parties agree that this development rendered NGS's appeal with respect to the Jurisdiction 8 solicitation moot.

and NGS's current contracts, NGS cannot win the MAC contract for Jurisdiction H (which represents 13.5% of the current A/B Medicare workload) because winning would cause NGS to exceed the Policy's workload caps.

## D

In November 2017, NGS filed a pre-award protest with the Government Accountability Office ("GAO"), arguing that the Award Limitations Policy in the Jurisdiction 8 solicitation did not allow for full and open competition because it precludes a successful best value offeror from receiving a MAC award where the contract award would cause that offeror to exceed the Policy's workload caps. GAO denied the protest in January 2018.

NGS then filed suit in the Claims Court on February 8, 2018. Before the Claims Court, NGS challenged the Jurisdiction 8 solicitation as well as the Jurisdiction H solicitation (which also included the Award Limitations Policy and remains at issue in this appeal). The Claims Court rejected NGS's protest.

NGS timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

In reviewing a grant of judgment upon the administrative record, we review the Claims Court's determination without deference, reapplying the same standard of review applicable in the Claims Court. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)). We therefore review the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Under that standard, we ask whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

In applying this standard of review, we determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine*, 575 F.3d at 1358 (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 (Fed. Cir. 2004)).

## III

This appeal requires us to analyze the propriety of the Award Limitations Policy included in the JH solicitation. As explained above, CMS developed the Policy to include in *all* MAC contract solicitations. It is not tailored to any solicitation. The rationale behind the Policy is two-fold. First, the agency has business continuity concerns related to overreliance on a particular MAC (i.e., that Medicare claims operations will be put at risk if a MAC with many contracts fails). Second, the agency has concerns about maintaining a competitive, dynamic MAC marketplace over the long term. The Award Limitations Policy attempted to address these concerns by setting workload caps so that a particular MAC cannot be awarded more than a certain percentage of the total A/B Medicare market.

As explained below, we reverse the Claims Court's decision in this case. In doing so, however, we find it important to delineate the bounds of what we do—and do not—decide.

At the outset, we take no issue with the particular concerns animating the Award Limitations Policy or with CMS's general ability to consider and address such concerns. Indeed, NGS concedes that CMS may take appropriate steps to address those very concerns. Appellant's Br. 12; *see also* Oral Arg. at 12:29–12:48. In our view, the issue presented is simply a procedural one—whether the agency complied with the Competition in Contracting Act ("CICA") and the Federal Acquisition Regulation ("the FAR") when it attempted to address its concerns by

developing a blanket policy applicable to *all* MAC solicitations that effectively excludes offerors from competing, without documenting the need for such action in light of a particular contract or a particular offeror. We do not hold that agencies cannot consider market concerns and exclude a particular source for such reasons. We conclude only that in doing so the agency must follow the congressionally designed procedure for addressing such concerns.

Importantly, we have no occasion to opine as to whether the particular methodology used by the agency, such as the particular workload cap percentages chosen, are supportable under a rational basis review standard.

With this in mind, we turn to the specific arguments raised in this case. We first address whether the JH solicitation provided for full and open competition in light of the Award Limitations Policy contained therein. Because we hold that the JH solicitation did not provide for full and open competition, we then address whether the agency's approach was otherwise permissible.

## A

CICA generally requires "full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1). In full, § 3301(a) states:

(a) In general.—Except as provided in sections 3303, 3304(a), and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services shall—

(1) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation; and

(2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

41 U.S.C. § 3301(a).[4]  As used in § 3301, "competitive procedures" is defined as "procedures under which an executive agency enters into a contract pursuant to full and open competition."  41 U.S.C. § 152.

The FAR explains that "41 U.S.C. [§] 3301 require[s], with certain limited exceptions (see subparts 6.2 and 6.3), that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts."  FAR 6.101(a).[5]  The FAR further explains that "[c]ontracting officers shall provide for full and open competition through use of the competitive procedure(s) contained in this subpart that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently."  FAR 6.101(b) (citing 41 U.S.C. § 3301).

The parties in this case agree that CICA's full and open competition requirement applies to MAC procurements. The parties rely on two provisions in the MAC Statute to show that the MAC Statute requires the use of competitive procedures and the application of the FAR to MAC contracting.  *See* 42 U.S.C. § 1395kk-1(a)(6) ("Except to the extent inconsistent with a specific requirement of this section, the Federal Acquisition Regulation applies to contracts under this section."); 42 U.S.C. § 1395kk-1(b)(1)(A) ("Except as provided in laws with general applicability to Federal acquisition and procurement or in subparagraph

---

[4]    We note that 10 U.S.C. § 2304(a) substantially parallels 41 U.S.C. § 3301(a).

[5]    The FAR is codified in Chapter 1 of Title 48 of the Code of Federal Regulations.

(B), the Secretary shall use competitive procedures when entering into contracts with [MACs] under this section, taking into account performance quality as well as price and other factors.").  In light of the parties' agreement that full and open competition is required, we do not address this proposition further.

B

We now turn to whether the JH solicitation provides for full and open competition in light of the Award Limitations Policy included therein.  We conclude it does not.

NGS contends that the Award Limitations Policy violates CICA's and the FAR's requirements for full and open competition.  The government disagrees, maintaining that the JH solicitation provides for full and open competition because all responsible sources are permitted to *submit* proposals.  The government also contends that even if the workload caps effectively make it impossible for certain offerors to win an award, the workload caps are simply "evaluation criteria" used to determine which offeror represents the best value to the government and are supportable if they have a rational basis.  Government's Br. 17–18, 24–30.  We address the government's arguments in turn below.

1

The government first contends that the JH solicitation provides for full and open competition because an offeror that would exceed the workload caps if awarded the JH solicitation may still *submit* a proposal.  The Claims Court agreed with the government on this point.  *Decision*, at 25–26 ("The Contract Award Limitations policy that NGS challenges does not prevent any potential offerors from submitting bids. . . . Therefore, because no offerors are prevented from submitting proposals in response to the Jurisdiction 8 and Jurisdiction H solicitations . . . the solicitations do not run afoul of the CICA's 'full and open competition' mandate.").

This focus on the ability to submit a proposal comes from 41 U.S.C. § 107, which explains that "the term 'full and open competition', when used with respect to a procurement, means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." In our view, however, the government's view of this statutory provision places too much significance on the word "submit." *See* FAR 2.101 ("Full and open competition, when used with respect to a contract action, means that all responsible sources are permitted *to compete*." (emphasis added)). We are unconvinced that the mere ability to submit an offer qualifies as full and open competition in this case, given that such a submission may be entirely futile in light of the solicitation's Award Limitations Policy.

Recognizing this futility concern, the government contends that submission may not always be meaningless because offerors that would exceed the workload caps at the time of submission may nonetheless win an award in two scenarios. Government's Br. 24–26.

As to the first scenario, the government states that, because the workload caps are applied at the time of award, an offeror that would exceed the workload caps at the time of submission may not exceed those caps at the time of award based on developments external to the pending solicitation (such as termination of a previously awarded MAC contract). Government's Br. 25; *see also Decision*, at 25–26. But this argument simply states the obvious—an offeror's ability to compete will not be limited by the workload caps if that offeror would not exceed the workload caps. This does not assuage our concern that an offeror who submits a proposal and remains affected by the workload caps throughout the MAC procurement will have submitted that proposal in vain.

The government's second scenario fares no better. It also fails to demonstrate that it would not be futile for an

offeror that would exceed the workload caps to submit a proposal.  The government points to the solicitation's Continuity Exception, arguing that an offeror may be awarded a contract even where such an award would cause the offeror to exceed the workload caps if making that award is necessary to ensure continuity.  Government's Br. 25 (citing J.A. 15548); *see also Decision*, at 26.  But both parties characterize this exception as applying only if *no other awardable proposal had been submitted* (e.g., if the offeror that exceeds the caps was the only responsible offeror).[6] *See, e.g.*, Appellant's Br. 11, 13, 20; Government's Br. 25–26 (stating that this exception permits CMS to award a contract "to an offeror that would otherwise be ineligible, if the offeror submitted the only otherwise awardable proposal (*e.g.*, it is the only responsible offeror to submit a proposal in that procurement or there are multiple responsible offerors but only one proposed a fair and reasonable price)").  This appears to be CMS's view of the Continuity Exception as well, as illustrated by the agency's response to a question received after the Continuity Exception was included in the Jurisdiction M solicitation.  CMS explained:

> [T]he [continuity] exception could be triggered if only one offeror were to respond to the RFP, and that single offeror would otherwise not qualify for an additional A/B MAC prime contract award under the policy.  Similarly, the exception could apply

---

[6]    "Responsibility refers to an offeror's apparent ability and capacity to perform all contract requirements and is determined, not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) (citing FAR 9.105-1 (2008)); *see also* FAR 9.104-1 (general responsibility standards).

if there were multiple offerors, but CMS found them all (save for one) to be non-responsible.

*Decision*, at 26 (quoting J.A. 14860). Thus, the Continuity Exception provides no assurance that submission of a proposal by an offeror who would exceed the workload caps would be anything other than futile, as long as one other awardable offeror exists.

In short, despite the government's efforts to show that it would be meaningful for an offeror that would exceed the workload caps to submit a proposal, we are unpersuaded. In light of the Award Limitations Policy, a responsible offeror that would exceed the workload caps is not given the same opportunity to win an award as other offerors that submitted awardable proposals. And the fact that an offeror that would exceed those caps was able to *submit* a proposal does nothing to address this concern.

2

The government next contends that even if the Award Limitations Policy effectively made it impossible for certain offerors to obtain the award, this would not violate full and open competition. Government's Br. 26. The government argues that the workload caps are merely evaluation criteria, and "solicitation terms that result in particular offerors being unable to win an award based upon their particular circumstances do not violate CICA's competition requirements, so long as the terms have a rational basis in light of the agency's needs." Government's Br. 28.

To support this argument, the government relies on our decision in *CHE Consulting, Inc. v. United States*, 552 F.3d 1351 (Fed. Cir. 2008), as well as three decisions from the Comptroller General. Government's Br. 26–27. But those decisions merely stand for the unremarkable proposition that a solicitation requirement (such as a past experience requirement) is not necessarily objectionable simply because that requirement has the effect of excluding

certain offerors who cannot satisfy that requirement. *See CHE Consulting*, 552 F.3d at 1352 (regarding a requirement that a single contractor provide both hardware maintenance and software maintenance for a particular system); *Armstrong Elevator Co.*, 2018 CPD ¶ 120, B-415809, 2018 WL 1542123 (Comp. Gen. Mar. 28, 2018) (regarding a solicitation's past experience requirements, where the solicitation pertained to upgrading multiple elevators and the agency included a requirement that the offeror have experience on projects with ten or more elevators); *Maersk Line, Ltd.*, 2012 CPD ¶ 200, B-406586, 2012 WL 2833687 (Comp. Gen. June 29, 2012) (regarding a challenge to a solicitation's requirement that the offeror be a citizen of the United States where the solicitation at issue implicated national security concerns); *Am. Diesel Eng'g Co.*, 92-1 CPD ¶ 79, B-245534, 1992 WL 15033 (Comp. Gen. Jan. 16, 1992) (regarding the agency's decision not to disclose to potential offerors data necessary for proposal preparation where the agency's right to distribute such data was in question, even though broad distribution of such data would have enhanced competition).

The Award Limitations Policy in this case is not comparable to the solicitation requirements at issue in the cases cited by the government. At the outset, we have some doubts as to whether the Policy should even be viewed as an evaluation factor. *See* FAR 15.304. For example, although the Policy is included as part of Section M (titled "EVALUATION FACTORS FOR AWARD"), J.A. 15544, its relative importance in the award decision is undisclosed, s*ee* FAR 15.304(d) (requiring that "[a]ll factors and significant subfactors that will affect contract award *and their relative importance* shall be stated clearly in the solicitation" (emphasis added)). Instead, the solicitation states that "[a]s described in Section M, Evaluation Factors for Award, the Government will evaluate Offerors' proposals based on cost and price and two (2) non-cost technical evaluation factors: Technical Approach and Past Performance."

J.A. 15519. Conspicuously absent from this list of considerations is any mention of the workload caps.

Moreover, even assuming the Policy is an evaluation factor, it is unlike the requirements at issue in the cases cited by the government. Unlike the requirements in those cases, the workload caps contained in the solicitation's Award Limitations Policy here are not requirements tailored to meet CMS's needs for a particular procurement. For example, in *Armstrong Elevator*, the solicitation required offerors to have experience on projects with ten or more elevators because the solicitation's statement of work required replacement of at least eight elevators. 2018 WL 1542123, at *1–2. Here, instead of being tailored to the needs of a particular contract, the workload caps are uniform parameters applicable to *all* MAC contracts. And although the government contends that the workload caps *are* tailored to each contract because the Policy reflects a need for continuous service in each particular MAC jurisdiction, we are not convinced. There is no indication that CMS had concerns about continuity within a particular MAC jurisdiction. Instead, the Policy is designed to address continuity concerns more generally by looking to the market as a whole.

In short, the way the Policy effectively excludes offerors is wholly unlike the way certain requirements effectively excluded offerors in the cases cited by the government. Here, the exclusion is not based on some capability or experience requirement, but is instead based on the agency's attempt to divvy up the MAC contracts in a way that ensures business continuity and helps maintain a competitive MAC market. CICA allows for a particular source to be excluded if doing so would "increase or maintain competition and likely result in reduced overall cost for the procurement" or if doing so would "ensure the continuous availability of a reliable source of supply of the property or service." 41 U.S.C. § 3303(a)(1)(A), (D). As discussed below, however, CMS did not rely on this statutory exception

in effectively excluding sources, and that is where the agency erred.

## C

Having concluded that the Award Limitations Policy precludes full and open competition and effectively excludes certain offerors from competition, we next consider whether CMS's actions can be otherwise justified.

 Congress specifically outlined the circumstances under which an agency may avoid CICA's full and open competition requirement. *See* § 3301(a). Here, the government relies on just one exception, arguing that the workload caps are "procurement procedures otherwise expressly authorized by statute." § 3301(a). We first address that argument and then address another exception, § 3303(a), that the Claims Court used to uphold the Policy in this case.

## 1

The government contends that the workload caps are "procurement procedures otherwise expressly authorized by statute." 41 U.S.C. § 3301(a). Government's Br. 31–36. Specifically, the government argues that two provisions in the MAC Statute "expressly authorize[]" the Award Limitations Policy.

First, the government argues that the workload caps are merely an additional eligibility requirement under 42 U.S.C. § 1395kk-1(a)(2)(D). That provision reads:

(2) Eligibility of entities

An entity is eligible to enter into a contract with respect to the performance of a particular function described in paragraph (4) only if—

> (A) the entity has demonstrated capability to carry out such function;

> (B) the entity complies with such conflict of interest standards as are generally

applicable to Federal acquisition and procurement;

(C) the entity has sufficient assets to financially support the performance of such function; and

(D) the entity meets such *other requirements as the Secretary may impose.*

42 U.S.C. § 1395kk-1(a)(2) (emphasis added).[7] The second provision the government relies on is 42 U.S.C. § 1395kk-1(b)(2), which reads:

(2) Compliance with requirements

No contract under this section shall be entered into with any [MAC] unless the Secretary finds that such [MAC] will perform its obligations under the contract efficiently and effectively and will meet such requirements as to financial responsibility, legal authority, quality of services provided, and other matters as the Secretary finds pertinent.

42 U.S.C. § 1395kk-1(b)(2).

The Claims Court relied in part on these two provisions to uphold the Award Limitations Policy. The court explained that the Award Limitations Policy "fits squarely within these two authorizations" because "[a]n entity, or set of affiliates, having too much work than it can reasonably manage certainly calls into question that entity's capability to successfully perform the contract." *Decision*, at 28. Moreover, the Claims Court explained that "[t]he

---

[7]    The Secretary of HHS has generally delegated the authority within Title XVIII of the Social Security Act to CMS. *See* Statement of Organization, Functions, and Delegations of Authority, 49 Fed. Reg. 35,247-01, 35,248 (Sept. 6, 1984).

potential of being overloaded is also inextricably tied to financial wherewithal and the quality of services that would be provided." *Id.*

With respect to the first provision, NGS contends that the requirements enumerated in § 1395kk-1(a)(2) are merely MAC-specific responsibility provisions and that the workload caps are not responsibility criteria because they do not speak to a particular offeror's ability to perform a particular MAC contract. As to the second provision, NGS contends that it is a restriction on the agency itself that precludes that agency from entering into a contract unless certain requirements are met.

We need not address NGS's arguments in detail because, as we explain next, we hold that the workload caps are not "expressly authorized by statute." Even assuming that the workload caps are "procurement procedures" as contemplated by 41 U.S.C. § 3301(a), and even assuming they "fit[] squarely within" these provisions as the Claims Court concluded, *see Decision*, at 28, in our view, the workload caps are not "expressly authorized" by those provisions.

As a comparison, express authority for procurement procedures otherwise permitted by statute is readily found in another provision of the MAC Statute, namely 42 U.S.C. § 1395kk-1(b)(1)(B). That provision permits CMS to renew a MAC contract without regard to "any other provision of law requiring competition, if the [MAC] has met or exceeded the performance requirements applicable with respect to the contract and contractor, except that the Secretary shall provide for the application of competitive procedures under such a contract not less frequently than once every 10 years." § 1395kk-1(b)(1)(B). And the MAC Statute expressly lists this renewal procedure as an exception to the MAC Statute's required use of competitive procedures. § 1395kk-1(b)(1)(A) ("Except as provided in laws with general applicability to Federal acquisition and

procurement *or in subparagraph (B)*, the Secretary shall use competitive procedures when entering into contracts with medicare administrative contractors under this section . . . ." (emphasis added)); *see also Rapides Reg'l Med. Ctr. v. Sec'y, Dep't of Veterans' Affairs*, 974 F.2d 565, 574 (5th Cir. 1992) (holding that a sharing program created by statute that allowed the Department of Veterans Affairs to enter into sharing agreements for the acquisition and joint use of medical technology was "expressly authorized by statute" within the meaning of CICA).

In short, the broad provisions cited by the government cannot serve as the express authority necessary to meet this exception. If these provisions could suffice to show such express authorization, seemingly any requirement could be justified regardless of its effect on full and open competition. We therefore reject the government's argument that the workload caps are "procurement procedures otherwise expressly authorized by statute" under § 3301(a).

2

As noted above, the government has not relied on other exceptions outlined in 41 U.S.C. § 3301(a), even though the government admits that some of these provisions are "tools that CMS *could* use to address its concerns regarding business continuity and competitive dynamics in appropriate circumstances." Government's Br. 30. But as explained below, to accomplish the end result of the Award Limitations Policy—i.e., excluding certain offerors from winning the award—the agency was required to follow the procedures outlined in § 3303(a) and the corresponding procedures set out in FAR 6.202.

As relevant here, § 3303(a) provides:

(a) Exclusion of particular source.—

> (1) Criteria for exclusion.—An executive agency may provide for the procurement of

> property or services covered by section 3301 of this title using competitive procedures but excluding a particular source to establish or maintain an alternative source of supply for that property or service if the agency head determines that to do so would—
>
>> (A) increase or maintain competition and likely result in reduced overall cost for the procurement, or for an anticipated procurement, of the property or services;
>>
>> . . . [or]
>>
>> (D) ensure the continuous availability of a reliable source of supply of the property or service; . . . .

41 U.S.C. § 3303(a)(1). Section 3303(a)(2) makes clear that a determination to exclude a source under § 3303(a)(1) "may not be made for a class of purchases or contracts." As evident from the language of the statute, this exception encompasses the very concerns CMS sought to address in this case—maintaining competition and ensuring the continuous availability of a reliable source of Medicare services. *See* § 3303(a)(1).[8]

---

[8]     Exclusion based on "increas[ing] or maintain[ing] competition" also requires the exclusion of a source to "likely result in reduced overall cost for the procurement." § 3303(a)(1)(A). Separately, we also note that § 3304 addresses a similar concern. Section 3304 allows for use of noncompetitive procedures where "it is necessary to award the contract to a particular source . . . to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in case of a national

FAR Subpart 6.2 implements this statutory provision. *See* FAR 6.200 ("This subpart prescribes policies and procedures for providing for full and open competition after excluding one or more sources."). Specifically, FAR 6.202(a) mirrors the language of § 3303(a)(1) regarding criteria for excluding a particular source. Importantly, FAR 6.202(b)(1) requires that "[e]very proposed contract action under the authority of paragraph (a) above shall be supported by a determination and findings (D&F) (see subpart 1.7) signed by the head of the agency or designee."[9] FAR 6.202(b)(1) further explains that "[t]his D&F shall not be made on a class basis." And if the basis for excluding a source is to increase or maintain competition, with the result being a likely reduction in overall costs, "the findings shall include a description of the estimated reduction in overall costs and how the estimate was derived." FAR 6.202(b)(3).

The HHS Acquisition Regulations ("HHSAR") directly address FAR 6.202.[10] Specifically, "[t]he Senior

---

emergency or to achieve industrial mobilization." § 3304(a)(3)(A). This section requires a written justification and approval. § 3304(e).

[9] "Determination and Findings (D&F) means a special form of written approval by an authorized official that is required by statute or regulation as a prerequisite to taking certain contract actions. The determination is a conclusion or decision supported by the findings. The findings are statements of fact or rationale essential to support the determination and must cover each requirement of the statute or regulation." FAR 1.701.

[10] HHS's acquisition regulations are found in Chapter 3 of Title 48 of the Code of Federal Regulations. HHSAR 301.103(c). The HHSAR establishes policies and procedures "that implement and supplement the Federal Acquisition Regulation (FAR)." HHSAR 301.101(a).

Procurement Executive (SPE) shall make the determination required in [FAR] 6.202(a)," HHSAR 306.202(a), and "[t]he contracting officer shall prepare the required determination and findings (D&F)" under FAR 6.202(b)(1), HHSAR 306.202(b)(1).

These statutory and regulatory procedures directly address how an agency may exclude a source to address certain market concerns. Indeed, it is not surprising that the Claims Court relied heavily on § 3303(a) to justify the workload caps. J.A. 567. The Claims Court reasoned:

> CMS is permitted to use "competitive procedures but excluding a particular source" if it determines that doing so would "increase or maintain competition and likely result in reduced overall cost for the procurement, or for an anticipated procurement" or to "ensure the continuous availability of a reliable source or supply of the property or service." 41 U.S.C. § 3303(a)(1)(A), (D). In other words, CMS can exclude a particular source—i.e., a potential successful offeror—from an A/B MAC competitive procurement to increase competition for A/B MAC services or to ensure that there will be a sufficient number of capable A/B MAC contractors. The Contract Award Limitations policy is designed to achieve both results by preventing CMS's overreliance on one or a handful of contractors. . . . Further, when there is such an individual determination to exclude a particular source from a competitive procurement to increase or maintain competition or to ensure a continuous supply of services, the justification and approval procedures outlined in 41 U.S.C. § 3304(e)(1) for noncompetitive procurements do not apply. *Id.* § 3303(c).

*Decision*, at 29.

But the Claims Court erred in relying on § 3303(a) to justify CMS's action in this case because even though

§ 3303(c) exempts this source-exclusion procedure from the justification and approval procedures outlined in § 3304(e)(1), the FAR requires that every proposed contract action under that authority be supported by a determination and findings signed by the head of the agency or designee, *see* FAR 6.202. Thus, even if CMS had intended to rely on § 3303(a), CMS violated the FAR in doing so by failing to supply a determination and findings. Indeed, there may have been a reason CMS chose to structure the Award Limitations Policy as a solicitation provision rather than relying on § 3303(a). As the government's brief tellingly notes, during the time period when CMS used a case-by-case approach to analyze business continuity and competition concerns (prior to development of the Award Limitations Policy), "CMS had been unable to identify factors that would 'tip the scales' for an offeror to lose an award and found it difficult to justify a decision to deny an award based upon business continuity and competition concerns under those circumstances." Government's Br. 10 (quoting J.A. 12073). But regardless of how difficult it may or may not be to justify excluding a source from competition, this justification is what the FAR requires.[11]

---

[11]  The Claims Court also explained that the Award Limitations Policy did not violate the prohibition on class determinations under § 3303(a)(2) because "the [P]olicy is only applied when there is a specific determination that the apparent successful offeror in a particular procurement would exceed the workload caps—it does not apply to a class of contracts or a class of contractors generally." *Decision*, at 29. Although we have some doubts about this reasoning, in light of our holding that the Award Limitations Policy was effectively an exclusion of a source under § 3303(a), which required a determination and findings under FAR 6.202, we do not address whether the blanket

In sum, Congress has provided specific means by which an agency may address general market concerns such as those identified by CMS in this case. In other words, the needs identified by the agency here are the exact needs contemplated by § 3303(a)(1)(A). And while the government admits that it *could* have relied on § 3303(a) and § 3304 to accomplish its goals, it maintains that it need not have done so. But allowing an agency to avoid the explanation requirements relevant to § 3303(a) and § 3304 by simply drafting a solicitation provision and labeling it an evaluation criterion would nullify the statutory procedures Congress put in place.

IV

In sum, the Award Limitations Policy precludes full and open competition by effectively excluding an offeror from winning an award, even if that offeror represents the best value to the government. And while agencies may consider market concerns and exclude a particular source for such reasons, the agency did not follow the congressionally designed procedure for doing so in this case.

As noted above, while we cannot uphold the procedure CMS used to address its concerns regarding overreliance and maintaining a competitive marketplace, we do not suggest that those concerns are improper or that they lacked a rational basis. Moreover, we do not suggest that the general methodology used by CMS, such as the particular market percentages employed, lacked a rational basis. Indeed, CMS may be able to rely in part on the same methodology to explain its rationale for excluding a particular offeror source under 41 U.S.C. § 3303(a) and FAR 6.202. Thus, although NGS has challenged the details of how the workload caps are structured as lacking a rational basis, we

---

Award Limitations Policy constituted an improper class determination under § 3303(a)(2).

leave those issues to be addressed in a case in which CMS has followed the proper procedures to address its overarching market concerns.

For the foregoing reasons, we reverse the decision of the Court of Federal Claims and remand for further proceedings.

**REVERSED AND REMANDED**